1  Mukund Rathi (State Bar No. 330622)
   mukund@eff.org
2  Cindy Cohn (State Bar No. 145997)
   cindy@eff.org
3  Corynne McSherry (State Bar No. 221504)
   corynne@eff.org
4  Aaron Mackey (State Bar No. 286647)
   amackey@eff.org
5  ELECTRONIC FRONTIER FOUNDATION
   815 Eddy Street
6  San Francisco, California 94109
   Telephone: (415) 436-9333
7  Facsimile: (415) 436-9993

8  *Counsel for J. Doe*

9

10              UNITED STATES DISTRICT COURT

11         FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                 SAN FRANCISCO DIVISION

13

14  IN RE SUBPOENA TO CLOUDFLARE        | Case No. _____

15

16                                      | **REQUEST FOR JUDICIAL NOTICE IN**
                                         **SUPPORT OF J. DOE'S MOTION TO**
17                                      | **QUASH SUBPOENA**

18

19

20

21

22         Pursuant to Federal Rule of Evidence 201 and the authorities cited below, J. Doe hereby

23  requests that this Court take judicial notice of the materials below.

24         A court may take judicial notice of undisputed matters of public record, including documents

25  on file in federal or state courts. *Harris v. Cty. of Orange,* 682 F.3d 1126, 1132 (9th Cir. 2012). This

26  Court "may take judicial notice of proceedings in other courts, both within and without the federal

27  judicial system, if those proceedings have a direct relation to matters at issue." *U.S. ex rel. Robinson*

28

                                        1

*Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992).

Information from Internet web sites are also properly subject to judicial notice, "to indicate what was in the public realm at the time." *Von Saher v. Norton Simon Museum of Art*, 592 F.3d 954, 960 (9th Cir. 2010); *see Brodsky v. Yahoo! Inc.,* 630 F. Supp. 2d 1104, 1111 (N.D. Cal. 2009) (taking judicial notice of "Yahoo! press releases, news articles, analyst reports, and third party press releases"); *Hendrickson v. Ebay, Inc.,* 165 F. Supp. 2d 1082, 1084 n.2 (C.D. Cal. 2001) (taking judicial notice of eBay's website and "the information contained therein").

J. Doe requests that the Court take judicial notice of the following materials:

**JUDICIAL RECORDS**

- Opinion and Order Granting Motions to Dismiss (Dkt. No. 136), *D'Ambly v. Exoo*, No. 2:20-cv-12880 (D. N.J. Aug. 9, 2022), attached hereto as Exhibit A.

- Second Amended Complaint (Dkt. No. 103), *D'Ambly v. Exoo*, No. 2:20-cv-12880 (D. N.J. Nov. 30, 2021), attached hereto as Exhibit B.

- Request for Entry of Default (Dkt. Nos. 132, 132-1, 132-2), *D'Ambly v. Exoo*, No. 2:20-cv-12880 (D. N.J. May 6, 2022), attached hereto as Exhibit C.

**INFORMATION ONLINE**

- Daly Barnett, *Doxxing: Tips To Protect Yourself Online & How to Minimize Harm*, EFF (Dec. 16, 2020), attached hereto as Exhibit D, and available at https://www.eff.org/deeplinks/2020/12/doxxing-tips-protect-yourself-online-how-minimize-harm.

- *Choosing your Web Host*, EFF, attached hereto as Exhibit E, and available at https://www.eff.org/keeping-your-site-alive/choosing-your-web-host.

- *Proxy Status*, Cloudflare DNS docs, attached hereto as Exhibit F, and available at https://developers.cloudflare.com/dns/manage-dns-records/reference/proxied-dns-records/.

REQUEST FOR JUDICIAL NOTICE ISO J. DOE'S MOTION TO QUASH SUBPOENA

- *Information for Privacy and Proxy Service Providers, Customers, and Third-Party Requesters*, Internet Corporation for Assigned Names and Numbers, attached hereto as Exhibit G, and available at https://www.icann.org/resources/pages/pp-services-2017-08-31-en.

- Federal Bureau of Investigation, Confronting White Supremacy, Statement Before the House Oversight and Reform Committee, Subcommittee on Civil Rights and Civil Liberties, Washington, D.C. (June 4, 2019), attached hereto as Exhibit H, and available at https://www.fbi.gov/news/testimony/confronting-white-supremacy.

For the foregoing reasons, the Court may properly consider Exhibits A-H as it considers J. Doe's motion to quash.

_____/s/ Mukund Rathi_____
Mukund Rathi
mukund@eff.org
Cindy Cohn
cindy@eff.org
Corynne McSherry
corynne@eff.org
Aaron Mackey
amackey@eff.org
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, California 94109
Telephone: (415) 436-9333
Facsimile: (415) 436-9993

Counsel for J. Doe

REQUEST FOR JUDICIAL NOTICE ISO J. DOE'S MOTION TO QUASH SUBPOENA

# EXHIBIT A

<u>Not for Publication</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

DANIEL D'AMBLY, et al.,

  *Plaintiffs*,

    v.

CHRISTIAN EXOO a/k/a ANTIFASH
GORDON, et al.,

      *Defendants*.

Civil Action No. 20-12880

<u>OPINION & ORDER</u>

<u>John Michael Vazquez, U.S.D.J.</u>

In this case, Plaintiffs, purported far right activists and their family members, take aim at Defendant Christian Exoo, a purported far left activist, and others for their alleged doxing campaigns because of Plaintiffs' political views. The overarching issue is whether the doxing crossed a line into unlawful action. Presently before the Court are motions to dismiss from the following Defendants: (1) St. Lawrence University ("SLU"), D.E. 116; (2) Vijaya Gadde and Twitter, Inc. ("Twitter" and collectively, the "Twitter Defendants"), D.E. 117; and (3) Christian Exoo (collectively, the "Moving Defendants"), D.E. 119. Plaintiffs filed briefs in opposition, D.E. 122, 123, 124, to which the Moving Defendants replied, D.E. 127, 128, 130.[1] The Court reviewed the parties' submissions and decided the motions without oral argument pursuant to Fed. R. Civ.

---

[1] The Court refers to SLU's brief in support of its motion (D.E. 116-2) as "SLU Br.", the Twitter Defendants' brief in support of their motion (D.E. 177-2) as "Twitter Br.", and Exoo's brief in support of his motion (D.E. 119-1) as "Exoo Br.". The Court refers to Plaintiffs' opposition to SLU's motion (D.E. 124) as "SLU Opp.", their opposition to the Twitter Defendants' motion (D.E. 123) as "Twitter Opp.", and their opposition to Exoo's motion (D.E. 122) as "Exoo Opp.". In addition, docket entries 122 and 125 appear to be duplicates. Finally, the Court refers to SLU's reply brief (D.E. 127) as "SLU Reply", the Twitter Defendants' reply brief (D.E. 128) as "Twitter Reply", and Exoo's reply brief (D.E. 130) as "Exoo Reply".

P. 78(b) and L. Civ. R. 78.1(b).  For the reasons set forth below, the Moving Defendants' motions are **GRANTED**.

## I.     FACTUAL[2] AND PROCEDURAL BACKGROUND

For purposes of the instant motions, the Court does not retrace this case's full factual and procedural history.  This Court's November 1, 2021 opinions granting Defendant Cohen, Weiss, and Simon, LLP's ("CWS") Rule 12(c) motion to dismiss[3], D.E. 97, and the remaining Defendants' Rules 12(b)(2) and 12(b)(6) motions to dismiss (the "Nov. 1 Opinion"), D.E. 99, include a detailed recounting of the factual background of this matter.  To the extent relevant to the instant motions, the Court incorporates the factual and procedural history from these prior opinions.

Plaintiff Daniel D'Ambly's initial Complaint largely addressed Exoo's alleged doxing campaign against D'Ambly.  D'Ambly alleged that Exoo identified D'Ambly as a white supremacist then instructed his associates to ascertain D'Ambly's identity and dox him, meaning to publicly disclose D'Ambly's personal, identifying information.  Compl. ¶ 1.  D'Ambly alleges that he was terminated from his job at the New York Daily News ("Daily News") because of the doxing.  *Id.*  On March 25, 2021, Plaintiffs filed the First Amended Complaint ("FAC"), which included allegations about doxing campaigns waged against D'Ambly and additional Plaintiffs.

---

[2] The factual background is taken from Plaintiffs' Second Amended Complaint ("SAC").  D.E. 103.  When reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court accepts as true all well-pleaded facts in the complaint.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(2), a court "must accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff."  *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 142 n.1 (3d Cir. 1992).

[3] Plaintiff Daniel D'Ambly's claim against CWS has been dismissed with prejudice and CWS is no longer a Defendant in this matter.  D.E. 133, 134.

Certain Defendants filed motions to dismiss the FAC pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). D.E. 74, 75, 78, 79. This Court granted Defendants' motions and dismissed certain of Plaintiffs' claims pursuant to Rules 12(b)(2) and 12(b)(6). D.E. 96-100, 102. The Court provided Plaintiffs with leave to file an amended pleading. *Id.*

Plaintiffs filed the SAC on November 20, 2021. D.E. 103. In the SAC, Plaintiffs include new factual allegations; assert claims against two additional Defendants, Nick Strickland and Torch Antifa Network ("Torch"); and include a new claim alleging a violation of Section 610 of the Labor-Management Relations Disclosure Act ("LMRDA"), 29 U.S.C. § 530. SAC ¶¶ 24-25, 204-211. The Moving Defendants subsequently filed the instant motions, which seek to dismiss certain claims in the SAC pursuant to Rules 12(b)(2) and 12(b)(6). D.E. 116, 117, 119.

## II.      STANDARD OF REVIEW

Rule 12(b)(2) permits a party to move to dismiss a case for lack of personal jurisdiction. In such a motion, the plaintiff bears the burden of demonstrating "sufficient facts to establish that jurisdiction is proper." *Mellon Bank PSFS Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992). In reviewing such a motion, a court "must accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff." *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 142 n.1 (3d Cir. 1992). But when a defendant raises a jurisdictional defense, "a plaintiff bears the burden of proving by affidavits or other competent evidence that jurisdiction is proper." *Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1302 (3d Cir. 1996).

Thus, to withstand a Rule 12(b)(2) motion, a plaintiff may not rely on the pleadings alone, as it "is inherently a matter which requires resolution of factual issues *outside the pleadings*." *Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61, 66 n.9 (3d Cir. 1984) (emphasis added). In conducting this jurisdictional analysis, district courts may rely upon the parties' declarations for

relevant factual support. *See, e.g.*, *Pausch LLC v. Ti-Ba Enters.*, No. 13-6933, 2014 WL 5092649, at *3-4 (D.N.J. Oct. 8, 2014) (using declarations from both parties to conclude that contacts with the forum were insufficient for personal jurisdiction); *Shnayderman v. Cell-U-More, Inc.*, No. 18-5103, 2018 WL 6069167, at *4 (D.N.J. Nov. 20, 2018) (using information from the plaintiff's complaint and declaration to determine that the defendant did not travel to the forum state or solicit a loan from the plaintiff in the forum state). Therefore, in determining whether personal jurisdiction exists, the Court looks beyond the pleadings to all relevant evidence and construes all disputed facts in favor of the plaintiff.

Rule 12(b)(6) permits a court to dismiss a complaint that fails "to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). For a complaint to survive dismissal under Rule 12(b)(6), it must contain sufficient factual matter to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Further, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of her claims." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016). In evaluating the sufficiency of a complaint, district courts must separate the factual and legal elements. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-211 (3d Cir. 2009). Restatements of the elements of a claim are legal conclusions, and therefore, are not entitled to a presumption of truth. *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011). The Court, however, "must accept all of the complaint's well-pleaded facts as true." *Fowler*, 578 F.3d at 210.

## III. ANALYSIS

### A. RICO Claims (Counts IV and V)

In Counts IV and V, Plaintiffs assert federal RICO claims, for racketeering and a civil RICO conspiracy, respectively, under the federal RICO statute, 18 U.S.C. § 1961 *et seq*. SAC ¶¶ 170-95. To bring a federal civil RICO claim, a plaintiff must allege "(1) the conducting of, (2) an enterprise, (3) through a pattern, (4) of racketeering activity." *Gunter v. Ridgewood Energy Corp*., 32 F. Supp. 2d 166, 173 (D.N.J. 1998). To establish a pattern of racketeering activity, a plaintiff must allege "at least two predicate acts of racketeering that occurred within ten years of each other." *Slimm v. Bank of Am. Corp*., No. 12-5846, 2013 WL 1867035, at *20 (D.N.J. May 2, 2013). Racketeering activity is defined in Section 1961(1)(B) as "any act which is indictable under" a number of enumerated federal laws; these federal offenses are called "predicate acts." *See* 18 U.S.C. § 1341; 18 U.S.C. § 1962(1)(B).

In the November 1 Opinion, the Court granted the Moving Defendants' motions to dismiss with respect to Plaintiffs' civil RICO claims because Plaintiffs failed to sufficiently allege any predicate acts. Specifically, the Court rejected Plaintiffs' allegations that the alleged Exoo Enterprise violated the Hobbs Act, 18 U.S.C. § 1951, or the Travel Act, 18 U.S.C. § 1952. Nov. 1 Opinion at 6-7. The Court explained that "[w]ithout sufficient predicate acts, Plaintiffs cannot plausibly allege that there was a pattern of racketeering activity." Nov. 1 Opinion at 8. The Moving Defendants now argue, amongst other things, that the substantive RICO claim fails because Plaintiffs still do not allege any predicate acts in the SAC. *See, e.g.*, SLU Br. at 9-10. The Court agrees.

Plaintiffs continue to allege in the SAC that the purported Exoo Enterprise violated the Hobbs Act and the Travel Act. SAC ¶ 183. Moreover, Plaintiffs again rely on the same alleged

wrongful conduct – the doxing, threatening messages, job loss and property damage. *See, e.g.*, *id.* ¶¶ 47-49, 52-53, 55-69.  With respect to Plaintiffs' alleged predicate acts, the SAC is unchanged from the FAC.  As a result, for the same reasons discussed in the November 1 Opinion, Plaintiffs fail to allege any conduct that could constitute a Hobbs Act or the Travel Act violation in the SAC. Plaintiffs' substantive RICO claim, therefore, fails for the same reasons discussed in the November 1 Opinion.

In their opposition brief, Plaintiffs allege that wire fraud, 18 U.S.C. § 1343, is the predicate offense for their substantive RICO claim.  Exoo Opp. at 16-17, 18-19.  But there are no allegations about wire fraud in the SAC.  As previously discussed in the November 1 Opinion, Plaintiffs cannot amend their pleading through their brief.  *See* Nov. 1 Opinion at 7 n.3 (quoting *Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988)).  Accordingly, the Court will not consider Plaintiffs' argument that wire fraud forms the basis of the substantive RICO claim.

Plaintiffs also argue that an alleged violation of Section 610 of the LMRDA, 29 U.S.C. § 530 constitutes a predicate act.  Exoo Opp. at 20-22.  Plaintiffs plead a Section 610 violation of the LMRDA as a stand-alone claim in Count VII of the SAC.  *See* SAC ¶¶ 204-211.  Plaintiffs do not explicitly plead that it constitutes a predicate act in either of their RICO claims.  Plaintiffs, however, do assert this claim against the Exoo Enterprise.  Thus, in viewing the pleading in the light most favorable to Plaintiffs, the Court considers the alleged violation of Section 610 as part of Plaintiffs' RICO claim.  But Section 610 is not encompassed within the list indictable offenses that may constitute RICO racketeering activity.  18 U.S.C. § 1961(1)(B).  Consequently, Plaintiffs cannot use an alleged violation of Section 610 to establish a predicate offense.[4]

---

[4] In arguing that Section 610 can be a RICO predicate act, Plaintiffs rely on *United States v. Local 560 of Int'l Bhd. of Teamsters*, 780 F.2d 267 (3d Cir. 1985), and related cases.  *See* Exoo Opp. at 20.  In *Local 560* the Third Circuit determined that a union member's LMRDA rights are intangible

In sum, Plaintiffs fail to plead any predicate acts to support their RICO claim. Again, without a predicate act, Plaintiffs cannot plausibly allege a pattern of racketeering activity and their substantive RICO claim fails. Count IV, therefore, is dismissed.

The Moving Defendants also seek to dismiss Plaintiffs' RICO conspiracy claim, 18 U.S.C. § 1692(d), due to the lack of a predicate offense. *See, e.g.*, Twitter Br. at 16. Because Plaintiffs fail to establish a substantive RICO claim, their RICO conspiracy claim also fails. *See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993) ("Any claim under section 1962(d) based on conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient.").

But Plaintiffs, relying on *Smith v. Berg*, 247 F.3d 532, 534 (3d Cir. 2001), contend that a RICO conspiracy claim can proceed even if other Section 1962 claims are dismissed. Exoo Opp. at 15. In *Smith*, the court addressed whether a defendant could be liable for a RICO conspiracy without personally committing or agreeing to commit the underlying predicate act. *Smith*, 247 F.3d at 536-38. The Court determined that provided that the defendant "knowingly agree[d] to facilitate a scheme which includes the operation or management of a RICO enterprise," the defendant could be liable for the conspiracy even if he did not personally commit or agree to commit the predicate acts. *Id.* at 537-38. The *Smith* reasoning presumes that someone within the

---

property that could be subject to extortion. *Local 560 of Int'l Bhd. of Teamsters*, 780 F.2d at 280-82. Thus, Hobbs Act violations satisfied the predicate act requirement for the RICO claim, not a stand-alone LMRDA violations. As explained in the November 1 Opinion, however, the Hobbs Act requires obtaining property from another. Nov. 1 Opinion at 7; *see also Scheidler v. Nat'l Org. for Woman, Inc.*, 537 U.S. 393, 405 (2003) (explaining that to conclude petitioners deprived or sought to deprive respondents of property without acquiring it "would effectively discard the statutory requirement that property must be obtained from another, replacing it instead with the notion that merely interfering with or depriving someone of property is sufficient to constitute extortion" under the Hobbs Act). Here, Plaintiffs still fail to allege that any Defendant obtained D'Ambly's LMRDA rights from him. Accordingly, Plaintiffs also fail to allege a Hobbs Act violation on these grounds.

conspiracy committed the predicate acts.  *Id.*  As discussed, Plaintiffs fail to allege any predicate

acts in this matter.  And a RICO conspiracy claim "must be dismissed if the complaint does not

adequately allege 'an endeavor which, if completed, would satisfy all of the elements of a

substantive [RICO] offense.'"  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 373 (3d Cir.

2010) (quoting *Salinas v. United States*, 522 U.S. 52, 65 (1997)).  Because Plaintiffs fail to allege

facts demonstrating that any Defendant engaged in conduct that could amount to a predicate act,

Plaintiffs do not satisfy the elements of a substantive RICO claim.  Therefore, Plaintiffs' RICO

conspiracy claim also fails and Count V is dismissed.

### B.  Violation of Section 610 of the Labor-Management Relationship Disclosure Act ("LMRDA"), 29 U.S.C. § 530 (Count VII)

As discussed, in Count VII, Plaintiffs allege that the Moving Defendants violated Section

610 of the LMRDA.  SAC ¶¶ 204-211.  The Moving Defendants maintain that Count VII must be

dismissed because it is a criminal statute with no private right of action.  *See, e.g.*, Twitter Br. at

28-30.  Ordinarily, federal criminal statutes do not provide individuals with a private right of action

in a civil case.  *See Weeks v. Bowman*, No. 16-9050, 2017 WL 557332, at *2 (D.N.J. Feb. 10,

2017) (dismissing civil matter for lack of subject matter jurisdiction because criminal statutes cited

by the plaintiff did not create a private right of action).  If a statute provides a private right of

action, however, an individual may "bring suit to remedy or prevent an injury that results from

another party's actual or threatened violation of a legal requirement."  *Wisniewski v. Rodale, Inc.*,

510 F.3d 294, 296 (3d Cir. 2007).

Section 610 provides as follows:

> It shall be unlawful for any person through the use of force or
> violence, or threat of the use of force or violence, to restrain, coerce,
> or intimidate, or attempt to restrain, coerce, or intimidate any
> member of a labor organization for the purpose of interfering with
> or preventing the exercise of any right to which he is entitled under

> the provisions of this chapter. Any person who willfully violates this section shall be fined not more than $1,000 or imprisoned for not more than one year, or both.

29 U.S.C. § 530. There is no explicit private right of action. The Moving Defendants also cite to numerous cases concluding that there is no private right of action for a Section 610. *See*, *e.g.*, *Rodriguez v. Serv. Empls. Int'l*, 755 F. Supp. 2d 1033, 1047-48 (N.D. Cal. 2010) (dismissing Section 610 claim asserted in civil suit because Section 610 "does not give rise to a private cause of action."). Plaintiffs do not address this argument and provide no authority to the contrary. Consequently, the Court concludes that Plaintiffs cannot pursue a claim under Section 610 of the LMRDA. Count VII is dismissed.[5]

### C. Personal Jurisdiction

Next, Exoo maintains that if Plaintiffs' RICO claims are dismissed, the claims asserted by every Plaintiff except for D'Ambly must be dismissed for lack of personal jurisdiction. Exoo Br. at 31-32. Plaintiffs argue that the Court has personal jurisdiction over Strickland and Torch, the two new Defendants. Exoo Opp. at 11-12. Plaintiffs also argue that the Court has statutory personal jurisdiction under 18 U.S.C. § 1965(b). *Id.* at 12-13. Plaintiffs, however, do not address whether the Court has personal jurisdiction over Plaintiffs' claims against Exoo.

As discussed in the November 1 Opinion, Section 1965(b) authorizes nationwide service of process for a plaintiff asserting a RICO claim. 18 U.S.C. § 1965. "Where Congress has statutorily authorized nationwide service of process, such service establishes personal jurisdiction, provided that the federal court's exercise of jurisdiction comports with Fifth Amendment due process." *Laurel Gardens, LLC v. Mckenna*, 948 F.3d 105, 122 (3d Cir. 2020) (quoting *Cory v.*

---

[5] The remaining claims in the SAC are not asserted against SLU or the Twitter Defendants. As a result, the Court only considers Exoo's arguments for dismissal for the remainder of this Opinion.

*Aztec Steel Bldg., Inc.*, 468 F.3d 1226, 1229 (10th Cir. 2006)). As discussed, Plaintiffs' RICO claims are dismissed for failure to state a claim. Consequently, Plaintiffs cannot rely on the RICO statute to establish personal jurisdiction. *See Pop Test Cortisol, LLC v. Univ. of Chic.*, No. 14-7174, 2015 WL 3822237, at *5 (D.N.J. June 18, 2015) (stating that because the plaintiff did not allege a plausible RICO claim "18 U.S.C. § 1965(d) cannot rightly form a basis for asserting personal jurisdiction over defendants").

In the November 1 Opinion, the Court also determined that because Exoo is domiciled in New York, general personal jurisdiction does not exist. Nov. 1 Opinion at 13. Therefore, Plaintiffs must establish that this Court has specific jurisdiction over Exoo. "Specific personal jurisdiction generally must be evaluated in both a claim-specific and defendant-specific fashion." *Al-Ghena Int'l Corp. v. Radwan*, 957 F. Supp. 2d 511, 531 (D.N.J. 2013) (quoting *Lexington Ins. Co. v. Forrest*, 354 F. Supp. 2d 549, 551 (E.D. Pa. 2005)); *see also Bristol-Myers Squibb Co. v. Super. Ct. of Ca., S.F. Cnty.*, 137 S. Ct. 1773, 1781-82 (2017) (explaining that the requirements for personal jurisdiction must be satisfied for each defendant and a defendant's relationship with a third party is an insufficient basis to confer personal jurisdiction). Thus, even if the Court can exercise personal jurisdiction over Strickland and Torch, Plaintiffs fail to explain how this would be relevant to the inquiry of whether the Court has personal jurisdiction over Exoo. But Plaintiffs' belief that Strickland and Torch somehow alter the personal jurisdiction analysis as to Exoo is undercut further because Count II, the only remaining claim asserted against Exoo, is only asserted against Exoo. Thus, whether the Court can exercise jurisdiction over either of these new Defendants is irrelevant.

This Court already determined that except for D'Ambly, none of the Plaintiffs demonstrated a sufficient connection between New Jersey, their claims, and Exoo in the November

1 Opinion. Accordingly, this Court dismissed the claims asserted by all Plaintiffs except for D'Ambly for lack of personal jurisdiction. Nov. 1 Opinion at 13-14. Nothing in the SAC changes this analysis. Count II, therefore, is dismissed as to every Plaintiff except D'Ambly for lack of personal jurisdiction.

### D. Tortious Interference (Count II)

In Count Two, D'Ambly alleges that Exoo intentionally interfered with his prospective economic benefit; specifically, D'Ambly's continued employment. SAC ¶¶ 154-61. Exoo first seeks to dismiss the claim because D'Ambly fails to allege that Exoo made untruthful statements. Exoo Br. at 33-34. Under New Jersey law, a plaintiff must plead the following elements to establish a claim:

> (1) a plaintiff's reasonable expectation of economic benefit or advantage, (2) the defendant's knowledge of that expectancy, (3) the *defendant's wrongful, intentional interference* with that expectancy, (4) in the absence of interference, the reasonable probability that the plaintiff would have received the anticipated economic benefit, and (5) damages resulting from the defendant's interference.

*Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 186 (3d Cir.1992) (emphasis added) (citing *Printing Mart–Morristown v. Sharp Elec. Corp.*, 563 A.2d 31, 37 (N.J. 1989)). Moreover, "it is generally recognized that a party may not be liable for tortious interference for merely providing truthful information to one of the contracting parties." *E. Penn Sanitation, Inc. v. Grinnell Haulers, Inc.*, 682 A.2d 1207, 1218 (N.J. App. Div. 1996); *see also Snitken v. Franklin Sussex Auto Mall*, No. A-2125-06T12125-06T1, 2008 WL 539024, at *4 (N.J. App. Div. Feb. 29, 2008) ("[T]he *Restatement (Second) of Torts § 727* comment B provides [that] [t]here is of course no liability for interference with a contract or a prospective contractual relation on the part of one who merely gives truthful information to another.").

The Court dismissed the tortious interference claim in the FAC, in part, because D'Ambly did not appear to allege that Exoo defamed or otherwise spread false information about D'Ambly in the Tweets that ultimately led to D'Ambly's termination. Nov. 1 Opinion at 14-16. In the SAC, D'Ambly still fails to allege that any of the Tweets contained false information. Instead, Plaintiffs argue that in their brief in opposition to Exoo's motion to dismiss the FAC, Plaintiffs affirmatively denied that they were fascists, Nazis, and white supremacists and reassert this position in their current opposition. Exoo Opp. at 5, 23. This allegation, or anything to that effect, does not appear in the SAC. Again, Plaintiffs cannot amend their pleading through a brief. As a result, the Court disregards this argument and concludes that D'Ambly fails to plead that any of Exoo's Tweets, as they pertain to D'Ambly, contained false information.

The Court acknowledged, however, that D'Ambly's allegations about a threatening message left with the Daily News, D'Ambly's employer, on January 11, 2019, could support a finding of wrongful and intentional interference. Nov. 1 Opinion at 17. In the SAC, Plaintiffs include more allegations to substantiate their allegations about the January 11 message. Critically, Plaintiffs allege that Strickland left the message, not Exoo. SAC ¶¶ 57, 62-63. But even assuming that Strickland's January 11 message amounts to wrongful and intentional interference (which the Court is not deciding), it is not clear how Exoo is liable for Strickland's message. As discussed, Plaintiffs' allegations that Exoo directed his associates to send harassing, intimidating and threatening phone calls and Tweets to the Daily News are not supported by the Exoo's actual Tweets. Nov. 1 Opinion at 16. Instead, Exoo instructed his followers to get D'Ambly fired and "warn them about Daniel D'Ambly." Torres Decl., Ex. D-II at 20-21, 26, 35. Thus Strickland's purportedly threatening message seems to go behind of scope of Exoo's instructions. And Plaintiffs provide no legal authority explaining how Exoo could be liable for Strickland's conduct

12

in such a scenario. Therefore, as pled, Plaintiffs fail to allege any wrongful interference by Exoo. Without such allegations, D'Ambly does not plead a tortious interference claim as to Exoo. Count II is dismissed.

## IV. CONCLUSION

For the foregoing reasons, and for good cause shown,

IT IS on this 9th day of August, 2022,

**ORDERED** that Defendants' motions to dismiss (D.E. 116, 117, 119) are **GRANTED**; and it is further

**ORDERED** that Counts IV, V and VII are dismissed as to all the Moving Defendants pursuant to Federal Rule of Civil Procedure 12(b)(6); and it is further

**ORDERED** that Count II is dismissed as to all Plaintiffs except Daniel D'Ambly pursuant to Federal Rule of Civil Procedure 12(b)(2) and as to D'Ambly pursuant to Federal Rule of Civil Procedure 12(b)(6); and it is further

**ORDERED** that dismissal is without prejudice. Plaintiffs shall have thirty (30) days to file an amended complaint that cures the deficiencies noted herein. If Plaintiffs do not file an amended pleading within that time, the claims dismissed herein will be dismissed with prejudice.

_____
John Michael Vazquez, U.S.D.J.

13

# EXHIBIT B

Patrick Trainor, Esquire (Attorney ID 242682019)
**LAW OFFICE OF PATRICK TRAINOR**
19 Union Avenue, Suite 201
Rutherford, New Jersey 07070
P: (201) 777-3327
F: (201) 896-7815
pt@ptesq.com
*Attorney for Plaintiffs*

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| DANIEL D'AMBLY; AARON WOLKIND; STEVE HARTLEY; RICHARD SCHWETZ; JOBEL BARBOSA; MATTHEW REIDINGER; JOHN HUGO; SEAN-MICHAEL DAVID SCOTT; THOMAS LOUDEN; ZACHARY REHL; AMANDA REHL; K.R., a minor, by and through her father ZACHARY REHL and her mother AMANDA REHL, MARK ANTHONY TUCCI, | CIVIL ACTION NO.: 2:20-cv-12880-JMV-JSA **SECOND AMENDED COMPLAINT** **JURY TRIAL DEMAND** |
| Plaintiffs, |  |
| vs. |  |
| CHRISTIAN EXOO a/k/a ANTIFASH GORDON; ST. LAWRENCE UNIVERSITY; TRIBUNE PUBLISHING COMPANY, LLC; NEW YORK DAILY NEWS; VIJAYA GADDE; TWITTER, INC; COHEN, WEISS AND SIMON, LLP; NICK STRICKLAND; TORCH ANTIFA NETWORK; UNNAMED ASSOCIATES 1 – 100, |  |
| Defendants. |  |

Plaintiffs, Daniel D'Ambly, Aaron Wolkind; Steven Hartley; Richard Schwetz; Jobel

Barbosa; Matthew Reidinger; John Hugo; Sean-Michael David Scott; Jr.*;* Thomas Louden;

Zachary Rehl; Amanda Rehl; K.R., a minor, by and through her father Zachary Rehl and her

mother Amanda Rehl (hereinafter collectively referred to as "Plaintiffs") by and through their

1

attorney the Law Office of Patrick Trainor, as and for their Complaint against defendants

Christian Exoo a/k/a @AntifashGordon, St. Lawrence University, Tribune Publishing Company,

LLC, New York Daily News, Vijaya Gadde, Twitter, Inc., Torch Antifa Network, Nick

Strickland, and Cohen, Weiss, and Simon, LLP, hereby alleges as follows:

## <u>STATEMENT OF THE CASE</u>

This action arises out of the conduct of defendant Christian Exoo (hereinafter "Exoo"),

under the Twitter username "@AntiFashGordon."  Defendant Exoo is a habitual doxer, who

leads, associates, and conspires with likeminded associates to dox[1] people ("targets") that they

claim are "fascists" and "white supremacists," in order to cause those targets to suffer

employment terminations, school expulsions, and to financially devastate them.  Exoo and

associates coupled doxing with direct action[2] against Plaintiffs.

Inserted throughout this Complaint are Tweets, blog posts, and statements made by Exoo

and associates with "calls to action," mocking results of direct action, concern for legal

ramifications, the promotion of the use of *67 to mask their phone numbers.  Exoo and

associates believe doxes are warnings against trespass against them and all doxes and dogpiling

are imbued with threats against their target.  Exoo often reminds his associates "we don't cry to

the cops or the court.  who protects us? we protect us."



---

[1] *Dox Definition*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/dox, "to publicly identify or publish private information about (someone) especially as a form of punishment or revenge." (last visited Nov. 14, 2021).

[2] *Direct Action Definition*, OxfordLearnersDictionaries.com, *The use of strikes, protests, etc. instead of discussion in order to get what you want*, https://www.oxfordlearnersdictionaries.com/us/definition/english/direct-action?q=direct+action (last visited Nov. 27, 2021).

Moreover, by Defendants' definition of what constitutes actual violence, doxes and their inherent threats, are actual violence.  As evidenced in the images below of a Twitter conversation, involving Exoo, his key Exoo associate, Twitter user @emilygorcenski, who is a verified blue check Twitter account, and Mark Pitcavage, Senior Research Fellow, Center on Extremism, Anti-Defamation League, Exoo and @emilygorcenski dispute Mr. Pitcavage's point that threats are not actual violence, and cite to the World Health Organization definition, which includes threats as actual violence to support his position.



Exoo admits leading, associating with, and conspiring with others in an enterprise that doxes and conducts direct action against alleged fascists and white supremacists.  In *Rolling Stone* magazine[3], Exoo was described as the "closest thing to a leader," and in a September

---

[3] Andy Kroll, *Meet the Undercover Anti-Fascists*, https://www.rollingstone.com/politics/politics-features/antifa-proud-boys-militia-trump-insurrection-1121933/ (last accessed Nov. 27, 2021).

2019, Medium.com interview as "@AntiFashGordon" (or "AFG"), Exoo is described as "just about the closest thing Antifa…has to a celebrity." In the Medium.com interview, Exoo described that[4]

> himself is exactly what we don't need," he explained. "I have a whole affinity group of people sharing intel with me. And I would be a lonely guy just screaming onto social media without communities to actually mobilize around this stuff."

Exoo's associates seconded Exoo's admission that an association of people engaged in doxing and direct action exists. On or about April 9, 2021, in the blog post titled "*Antifash Gordon's Abuse, Abusers not welcome here: A statement of separation from AntiFash Gordon*," associates announced they will no longer work with Exoo, because of his abusive behavior, which included using doxing and direct action for his own financial gain.[5]

> and presents himself as an exemplar of anarchistic values. The reality is that AFG is a selfish, self-interested, reckless, and harmful individual who has cynically used a movement working for a better world as a vehicle for his own financial and social gain, at the expense of others, with no indication

Another former associate recently described Exoo's @AntiFashGordon Twitter account as the public face of a "vast underground network." Moreover, associates admitted in the *Statement of Separation* blog post that for doxing and direct action Exoo compensated them with



wetland waifu 🌾
@endeveryting

"security culture" against disabled, trans, poc to keep their spaces insular that were easily infiltrated.

This isn't about one person. AFG is the public face of a vast underground network whose labor he takes credit. AFG isn't just Ex_o, it started as a Boston DSA project

10:52 PM · Nov 6, 2021 · Twitter Web App

---

[4] Aaron Gell, *Anti-Fascists Are Waging a Cyber War – And They're Winning*, Medium.com, September 9, 2019, https://gen.medium.com/antifas-keyboard-warriors-254f62be2a95 (last accessed Nov. 27, 2021). *See also* Ex. A.
[5] *Antifash Gordon's Abuse, Abusers not welcome here: A statement of separation from AntiFash Gordon,* (Apr. 9, 2021) *formerly available* at https://antifashgordon.noblogs.org (last accessed May 12, 2021) has since been taken offline but a copy is *available at* https://web.archive.org/web/20210409230402/https://antifashgordon.noblogs.org/ (last accessed Nov. 27, 2012). *See also* Ex. B.

cash and other valuable consideration, such as money, connections to jobs, and opportunities for media appearances with his friends in the press. [6]

The *Statement of Separation from AntiFash Gordon* is signed by members of Defendant Torch Antifa, who published their own statement of solidarity and separation Exoo that similarly described the existence of an organization. [7] Torch Antifa described Exoo as someone who holds a "position of power and influence" that enables him to serve has the "arbiter and distributor of research information, media opportunities, and financial resources to other antifascists," but who failed to acknowledge the "collective labor" behind *@AntiFashGordon* Twitter account. [8]

The association obtains private and confidential information of their targets, who use online aliases. Publication of the dox is the first step. Once the dox is published Exoo and associates dogpile a target's employers, co-workers, schools, acquaintances. Dogpiling is when an individual uses Twitter to incite their followers to say or do a specific thing, such as reply to another person with abusive messaging, [9] or as Exoo himself put it:

> The next step, Gordon continued, was to "find some point of vulnerability: employer, landlord, school, church, anywhere where they would lose some kind of social status or take a hit." Often, a single phone call alerting an employer to the presence of a white nationalist on the payroll was enough to get someone fired; other times, an online publicity campaign is launched to apply community pressure. "This is not a thing we take joy in — the personal suffering of white supremacists," David said. "But it is a good

---

[6] *Id.*

[7] *Concerning Antifash Gordon: A Torch Statement in Solidarity with the Victims of Abuse*, (Apr. 9, 2021) *formerly available at* https://torchantifa.org/concerning-antifash-gordon-a-torch-statement-solidarity-with-victims-of-abuse (last accessed May 12, 2021), however, on or about November 7, 2021, Torch's statement in the above link was taken down and it now links to a statement explaining that Torch removed the original statement in solidarity, because they received a "Cease and Desist" notice from Christian Exoo's attorneys. (last accessed Nov. 27, 2021). A copy of both statements is attached hereto as Exhibit C.

[8] *Concerning Antifash Gordon: A Torch Statement in Solidarity with the Victims of Abuse*, (Apr. 9, 2021) *formerly available at* https://torchantifa.org/concerning-antifash-gordon-a-torch-statement-solidarity-with-victims-of-abuse (last accessed May 12, 2021). *See also* Ex. CC.

[9] *https://help.twitter.com/en/rules-and-policies/coordinated-harmful-activity* (last accessed Nov. 14, 2021).

## THE PARTIES

1.       Daniel D'Ambly (hereinafter "D'Ambly"), was a twenty-seven (27) year member of Local One-L, Graphic Communications Conference of the International Brotherhood of Teamsters, who was employed as a was a plate maker for the New York Daily News in Jersey City, New Jersey until January 18, 2019.  D'Ambly was doxed by Exoo on October 29, 2018.  In the dox D'Ambly was labeled a 'fascist' and/or a 'white supremacist.'  D'Ambly is a member of the New Jersey European Heritage Association ("EHA"), a non-violent, pro-domestic policy organization that the Exoo and associates have labeled a white supremacist hate group, which D'Ambly leads.  D'Ambly and the EHA, actively participate in political rallies, peaceful political protests, pamphleteering, and speech that is protected by U.S. Const. amend. I and N.J. Const. art. I, ¶ 6.  D'Ambly is an individual domiciled in the State of New Jersey and a "person" as defined under 18 U.S.C. § 1961(3).

2.       Zachary Rehl ("Rehl") was employed by New York Life Insurance Company in Philadelphia when he was doxed by Exoo in or about August 2017, and labeled a fascist and white supremacist.  Rehl is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

3.       Amanda Rehl ("AmRehl") is the spouse of Zachary Rehl.  AmRehl is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

4.       K.R. ("K.R."), is the minor child of Zachary Rehl and Amanda Rehl.  K.R. is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

5.      Aaron Wolkind ("Wolkind") was a Technical Support Specialist for Aerzen USA Corporation ("Aerzen") when he was doxed by Exoo on or about June 2019, and labeled a fascist, white supremacist, and a neo-Nazi.  Wolkind is an individual domiciled in the State of Delaware and a "person" as defined under 18 U.S.C. § 1961(3).

6.      Steven Hartley ("Hartley"), is a logistics manager for American Expediting located in Folcroft, Pa.  On November 29, 2018, he was doxed by Exoo and labeled a Nazi, racist and white supremacist who was a threat to women and minorities.  Hartley is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

7.      Mark Anthony Tucci ("Tucci") was employed at Aldo's Pizzarama in Philadelphia when he was doxed by Exoo on December 10, 2018, and labeled a fascist, racist, and white supremacist.  Tucci is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

8.      Richard Schwetz ("Schwetz") was employed at Inova Payroll in Lancaster, Pa., when he was doxed by Exoo in or about June 2020, and labeled a fascist, racist, and white supremacist.  Schwetz is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

9.      Jobel Barbosa ("Barbosa") is Puerto Rican and a permanently disabled veteran, who was employed as a Detail Department Manager at Jaguar Land Rover Willow Grove, in Willow Grove, Pa., when he was doxed by Exoo on June 22, 2019, and labeled a fascist, racist, and white supremacist.  Barbosa is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

10.   Matthew Reidinger ("Reidinger") was employed in Coal Township, Pa.  On November 27, 2018, he was doxed by Exoo and labeled a fascist and white supremacist. Reidinger is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

11.   John Hugo ("Hugo") was employed as a dispatch manager for Green and Yellow Cab in Somerville, Massachusetts when he was doxed by Exoo on January 2, 2020, and labeled a fascist and white supremacist.   Hugo is an individual domiciled in the Commonwealth of Massachusetts and a "person" as defined under 18 U.S.C. § 1961(3).

12.   Sean-Michael David Scott ("Scott") was employed in Seattle, Washington when he was doxed by Exoo on September 16, 2019, and labeled a fascist, white supremacist, and anti-Semite.  Scott is an individual domiciled in the State of Florida and a "person" as defined under 18 U.S.C. § 1961(3).

13.   Thomas Louden ("Louden") is a 30-year volunteer firefighter and the appointed Deputy Emergency Management Coordinator for Hilltown Township, Pennsylvania and was employed as the Director of Managed Care at Thomas Jefferson University Hospital in Philadelphia for twenty-three (23) years when he was doxed by Exoo on November 2, 2020. Louden is an individual domiciled in the Commonwealth of Pennsylvania and a "person" as defined under 18 U.S.C. § 1961(3).

14.   Plaintiffs Wolkind, Hartley, Schwetz, Rehl, Barbosa, and Tucci are members of the Philadelphia chapter of the Proud Boys (hereinafter "PPB" or "Proud Boys").  Plaintiff Reidinger is a member of the Harrisburg chapter of the Proud Boys ("HPB").  The Proud Boys are a diverse, multi-racial, multi-ethnic, fraternal, males-only drinking club, who consider themselves "western chauvinists."

15.     Hugo is the President of Super Happy Fun America, a right of center civil rights organization focusing on defending the American Constitution, opposing gender madness, and defeating cultural Marxism.  Super Happy Fun America is best known for organizing the 2019 Boston Straight Pride Parade.  Hugo was the 2018 Republican Candidate for Massachusetts' 5th Congressional District.

16.     Defendant Christian Exoo ("Exoo" or "@AntiFashGordon") is a library building supervisor and lecturer at St. Lawrence University.  Exoo is a self-described anti-fascist, notorious doxer, and leader of Antifa, who by doxing others has acquired a great deal of notoriety and infamy.[10]  Exoo currently publishes Tweets under Twitter username "@AntiFashGordon."  Exoo is an individual domiciled in the State of New York and a "person" as defined under 18 U.S.C. § 1961(3).

17.     St, Lawrence University ("St. Lawrence" or "STL") is a private four-year university with its principal place of business located at 116 Vilas Hall, 23 Romoda Drive, Canton, New York 13617, and a "person" as defined under 18 U.S.C. § 1961(3).

18.     Tribune Publishing Company ("Tribune") is a media company organized under the laws of the State of Delaware with its principal place of business located at 160 N. Stetson

---

[10] *Anti-Fascists Are Waging A Cyber War – And They're Winning*, Medium.com (Sep. 9, 2019) https://gen.medium.com/antifas-keyboard-warriors-254f62be2a95 (last accessed Sep. 15, 2020); *Comcast fires employee with alleged ties to Proud Boys, We the People Rally*, PhillyVoice.com (November 15, 2018) https://www.phillyvoice.com/comcast-fires-employee-proud-boys-alt-right-philadelphia-rally/ (last accessed Sep. 15, 2020); *The Right Wing Is Trying to Make It a Crime to Oppose Fascism*, Truthout.org (Aug. 9, 2019) https://truthout.org/articles/the-right-wing-is-trying-to-make-it-a-crime-to-oppose-fascism/ (last accessed Sep. 15, 2020); *How to Spot An Abuser, Featuring Antifash Gordon, In His Own Words: A Step By Step Guide, and Also F\*\*\* That Guy,* Medium.com (Jun. 25, 2020) https://medium.com/@abuse_isnt_revolutionary/how-to-spot-an-abuser-featuring-antifash-gordon-in-his-own-abuser-words-7b39f4657b19 (last accessed Sep. 15, 2020).

Avenue, Chicago, Illinois 60601 that conducts its business throughout the United States and is a "person" as defined under 18 U.S.C. § 1961(3).

19.     New York Daily News Company ("Daily News") is owned by the Tribune Publishing Company (Tribune and Daily News are sometimes hereinafter referred to collectively as "Daily News") with a place of business located at 125 Theodore Conrad Drive, Jersey City, New Jersey 07305, and 4 New York Plaza, New York, NY 10004.  The Daily News is a "person" as defined under 18 U.S.C. § 1961(3).  At all times relevant, the Tribune Publishing Company had the right and did exercise control over the actions of the New York Daily News.

20.     Vijaya Gadde ("Gadde") is the Head of Legal, Public Policy, and Trust and Safety Lead at Twitter, Inc.  At all times relevant, Vijaya Gadde was the sole decision maker and person authorized to permanently ban Twitter users who violated Twitter's Terms of Service and Rules. She is a "person" as defined under 18 U.S.C. § 1961(3).  Gadde is believed to be domiciled in the State of California.

21.     Twitter, Inc. ("Twitter"), is a company organized under the laws of the State of Delaware with its principal place of business located at 1355 Market Street, San Francisco, CA 94103, that conducts its business globally and a "person" as defined under 18 U.S.C. § 1961(3).

22.     Exoo and associates are a criminal enterprise as defined under 18 U.S.C. § 1961(4).

23.     Cohen, Weiss, and Simon, LLP ("CWS") is a law firm with its principal place of business located at 900 3rd Avenue, #2100, New York, New York 10022 and a "person" as defined under 18 U.S.C. § 1961(3).

24.     Nick Strickland is an individual domiciled in the State of New Jersey and a "person" as defined under 18 U.S.C. § 1961(3), he controls and publishes Twitter username "@NStricklanded."

25.     Torch Network a/k/a Torch Antifa Network describes itself as "*a network of Militant antifascists across (but not limited to) the United States.  We are born out of, and pay our respects to, the Anti-Racist Action Network.  We are dedicated to confronting fascism and other element of oppression.  We believe in direct action.*"[11]





Torch Antifa controls and publishes Twitter account "@TorchAntifa" and internet website *https://torchantifa.org*.  Torch Antifa has no known address but its internet domain *torchantifa.org* is registered to Pennsylvania non-profit organization One People's Project, whose principal address is in New Brunswick, New Jersey.

**JURISDICTION AND VENUE**

---

[11] Torch Network, *https://torchantifa.org/about/*, (last accessed Nov. 14, 2021).

26.     Jurisdiction of this Court is proper because this litigation arises under federal law, namely 18 U.S.C. §§ 1961 to 1968.  This Court has jurisdiction over this matter under 28 U.S.C. § 1331.

27.     The Court has supplemental jurisdiction over the state law claims asserted in this case under 28 U.S.C. § 1367(a).

28.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and the threatened and actual harm occurred in this District by reason of Defendants' conduct as alleged below.

## FACTS PERTINENT TO ALL PLAINTIFFS

29.     Exoo and associates use the terms fascists and/or white supremacists interchangeably.

30.     Defendant Exoo publishes Tweets and doxes under Twitter username "*@AntiFashGordon*" a leading Antifa Twitter account that as of November 14, 2021, has 53,534 Twitter followers.  The headline of @AntiFashGordon's public profile as seen below states "I expose fascists via #OSINT, get them fired, de-homed, kicked out of school, etc."



31.     Doxing is prohibited by Twitter's Private Information Policy within their Terms of Service and Rules ("TOS").[12]

32.     Twitter's TOS also prohibit Coordinated harmful activity, specifically Twitter prohibits *Social Coordination*, which Twitter defines as "on or off-Twitter coordination among a group of people to amplify or propagate a specific message…an individual using Twitter to incite their followers to say or do a specific thing, such as reply to another person with abusive messaging – a practice referred to as "dogpiling."[13]

33.     Upon information and belief, Exoo is a habitual doxer and ban evader, who has been permanently banned at least twice before Exoo he began to publish and control *@AntiFashGordon*, is known to Twitter's Trust & Safety Council ("TSC").  A ban evader is a person who creates a new Twitter account after receiving a permanent ban, which is a lifetime ban.  The ban evader's new account is called a "ban evasion account," and is prohibited by Twitter rules.[14]  Twitter has previously permanently banned *@ChrisExoo*,[15] *@ChristianExoo*.[16]



---

[12] *https://help.twitter.com/en/rules-and-policies/personal-information* "You may not publish or post other people's private information without their express authorization and permission.  We also prohibit threatening to expose private information or incentivizing others to do so." (last accessed Nov. 14, 2021).
[13] *https://help.twitter.com/en/rules-and-policies/coordinated-harmful-activity* (last accessed Nov. 14, 2021).
[14] *https://help.twitter.com/en/rules-and-policies/enforcement-options* "Permanent suspension: This is our most severe enforcement action.  Permanently suspending an account will remove it from global view, and the violator will not be allowed to create new accounts." (last accessed Nov. 14, 2021).
[15] *https://twitter.com/ChrisExoo* (last accessed Nov. 14, 2021).
[16] *https://twitter.com/ChristianExoo* (last accessed Nov. 14, 2021).

34.   Upon information and belief, Twitter agreed to allow Exoo, a known ban evader change his username @DoxSavage to @AntiFashGordon, in lieu of third permanent ban.



35.   Exoo described his associates as "our entire crew," and acknowledged monthly IT costs for the entire crew of about $50.[17]

> others in the movement. And he outlined the expenses. "We fight fascism on a budget," he said. "For our entire crew — and this includes database subscriptions, VPNs, burner phones, and encrypted data storage — it comes to about $50 a month."

36.   As seen below Exoo insists associates continue dogpiling until the target's employer publicly announces the target's termination.



37.   Exoo and associates conspire with well-known doxer who publishes Twitter account @emilygorcenski, which is a blue check Twitter verified account, who Exoo has cited as a mentor.

---

[17] Aaron Gell, *Anti-Fascists Are Waging a Cyber War – And They're Winning*, Medium.com, September 9, 2019, https://gen.medium.com/antifas-keyboard-warriors-254f62be2a95 (last accessed Nov. 27, 2021).



38.    Verified blue check Twitter account @emilygorcenski is followed by Twitter

CEO Jack Dorsey, accordingly @*emilygorcenski* can send private direct messages to @*jack*, and

@*jack* sees @emilygorcenski's Tweets in his home timeline when he logs on to his account.[18]

---

[18] Following FAQ's, Twitter.com *available at* https://help.twitter.com/en/using-twitter/following-faqs#:~:text=Followers%20are%20people%20who%20receive,they%20log%20in%20to%20Twitter (last accessed Nov. 30, 2021).



39.    Twitter account *@emilygorcenski* has exhibited sliding into *@jack* direct

messages to get a Twitter account banned for "deadnaming" when Twitter Support did not ban

the account, and also boasted about surviving @jack's follower purge in 2019.



40. As a result of Exoo and associates conduct described herein, every doxed Plaintiff was threatened, had their families threatened, and sustained property damage.

## **DANIEL D'AMBLY**

41. D'Ambly repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 40 with the same force and effect as if set forth in detail herein again.

42. Upon information and belief, the Exoo Enterprise targeted D'Ambly as a fascist and white supremacist at some point in or about January 2018.

43. Upon information and belief, in and before September 2018, Twitter received and investigated complaints that Exoo's former Twitter account @*DoxSavage* was doxing and engaging in abusive behavior.

44. Upon information and belief, on or about October 1, 2018, Gadde and Twitter agreed to allow @*DoxSavage* to undergo a username change in lieu of a third permanent ban.

45. On October 11, 2018, @*DoxSavage* Tweeted a farewell announcement to his followers: "Hey folks—I just underwent a name change from @*DoxSavage* to @*AntiFash Gordon*. I'll be back tomorrow to expose more violent fascists who were on the ground in Providence on 10/6."





46.     Exoo's change for his evasion account @*DoxSavage* to @*AntiFashGordon* prevented him from losing approximately 15,000 @*DoxSavage* followers.

47.     On October 29, 2018, at 11:49 a.m., @*AntiFashGordon* doxed D'Ambly in a massive twenty-two count Tweet thread that included D'Ambly's name, hometown, photograph, employer, occupation, employer's location, multiple telephone numbers for his employer, labor union Referendum Board he chaired, and the names of the other Referendum Board members.



**AntiFash Gordon**
@AntiFashGordon

8.) And until now, no one knew who was behind it.

It's Daniel D'Ambly, of Dayton, New Jersey, a newspaper printer for @NYDailyNews in Jersey City.

11:49 AM · Oct 29, 2018

48.     In the dox, @AntiFashGordon labeled D'Ambly a "Nazi" and directed associates to send harassing, intimidating, and threatening phone calls, and Tweets to the Daily News's Twitter username @*NYDailyNews*, to extort D'Ambly's termination.  *See* Exhibit C, Exoo's First Dox of D'Ambly October 29, 2018.

49.     Exoo's dox directed:

a.   In the 19th Tweet, @*AntiFashGordon* directed his associates "stay on top of this, too.  If you don't hear back from @NYDailyNews, keep tweeting at them."  Call their printing facilities in Jersey City at (201) ***-**** (number provided in original Tweet) and warn them about Daniel D'Ambly…"



b. A follow up Tweet included a second telephone number for the Daily News and a

subsequent Tweet included the direct telephone number to D'Ambly's print shop.



c. Exoo associates dogpiled *@NYDailyNews* and *@Teamsters*.







d. Upon information and belief, from October 29, 2018, to January 11, 2019, the

Exoo Enterprise directed no less than one-hundred and ninety-one (191) Tweets

to @DailyNews plus an unknown number of phone calls.

e. D'Ambly was never told of the threats or warned to take safety precautions.

50. On October 30, 2018, without warning D'Ambly of the threats, Tribune engaged

Insite Risk Management ("Insite") to investigate D'Ambly. Insite submitted its "Private

20

Investigation Report" ("Report") to the Tribune on December 4, 2018. The Report acknowledged @AntiFashGordon's doxing was the impetus for the investigation. The Report included videos of D'Ambly and others using imprudent language during political rallies.

51.    On or before January 8, 2019, EHA posted flyers on public bulletin boards in Princeton, New Jersey that announced an "It's okay to be white" protest march purportedly scheduled for January 12, 2019.

52.    On January 9, 2019, *@AntiFashGordon* re-Tweeted the "It's okay to be white" march to his associates and doxed D'Ambly again by Tweeting, "If anyone wants their leaders name, it's Dan D'Ambly."

53.    On January 10, 2019, *@AntiFashGordon* published a Tweet that referenced EHA's purported march and directed his associates to "show up and shut down" the purported march "And please say hi to their leader, Dan D'Ambly for me."



54.    On January 10, 2019, D'Ambly was called to an interview with Jean Nechvatal ("Nechvatal), Tribune's Vice President, Talent Management & Learning and James R. Brill

("Brill"), Daily News's Sr. Vice President of Operations. D'Ambly was accompanied at the meeting by Union Steward Pete Cairnie. During the meeting, D'Ambly was confronted with content of the Report, but not informed of the report's existence. D'Ambly acknowledged using imprudent language in a private conversation during a protest.

55. On January 11, 2019, at 10:14 a.m., Exoo reiterated "show up and show these pricks that we don't tolerate hate in our streets" to stop D'Ambly's purported march. Exoo also stated that he had not gotten official word of that D'Ambly was terminated.



56. Exoo reminded his associates to prepare for conflict, "Remember that the police won't protect us here."



57. The morning of January 11, 2019, after Exoo's Tweet, Edward Bushey, Sr. Vice President, General Manager, Manufacturing and Distribution at Tribune delivered recordings of threats to the Daily News. The callers stated if they continued to employ D'Ambly the Daily

News was responsible for "any violence or blood spilled is also on your hands."  Upon information and belief, the call was received from phone number (732) 744-4937.[19]



--------- Forwarded message ----------
From: ▮▮▮▮▮George" <▮▮▮▮▮@nydailynews.com>
To: ▮▮▮▮▮Ed" <▮▮▮▮▮@tribpub.com>
Cc:
Bcc:
Date: Mon. 14 Jan 2019 19:33:44 +0000
Subject: FW: Voicemail from 7327444937

Ed.

This is the second message looks like the phone number is there.

George

From: Cisco Unity Connection Messaging System [mailto: ▮▮▮▮▮@relay-int.tribune.com]
Sent: Friday, January 11, 2019 10:21 AM
To: ▮▮▮▮▮@relay-int.tribune.com
Subject: Voicemail from 7327444937

58.     On January 11, 2019, at 3:30 p.m., D'Ambly was called to a second meeting with Brill, wherein Brill issued D'Ambly a "Last and Final Warning" that stated the "*ONLY reason that you are not being terminated immediately is because, thus far, we have not determined that your activities with NJEHA has occurred at work and/or derogatory comments were made about any co-workers."*  The warning continued "should we learn that you engaged in any inappropriate speech or behavior in the workplace or with regard to any other employee, or if the Company or any of its employees suffer any backlash as a result of your association with the NJEHA, your conduct will be considered "work-related" and you will be terminated immediately."

59.     The meeting occurred five (5) hours after threats were received, but Brill did not inform or warn D'Ambly of the threats.

60.     At 4:34 p.m. on January 11, 2019, *@AntiFashGordon* threatened D'Ambly by stating "Regardless, I'm gonna spend the next week wrecking your fucking life, Dan D'Ambly."

---

[19] Electronic media copies of the threats will be submitted to the Court and all defendants on a USB thumb drive.



61.    On or about the evening of January 11, 2019, D'Ambly's vehicle was "keyed" (scratched) and tires slashed while it was parked outside of his home on private property. After his vehicle was damaged, D'Ambly received a text message from unknown phone number (732) 744-4937, that stated "So your thing went well today? Did you guys get there ok?" A police report for a bias incident, criminal mischief, and harassment was filed with the South Brunswick Police Department. The phone number (732) 744-4937 is cited in South Brunswick Police Department incident report image below. *See also* Exhibit E, South Brunswick Police Department Incident Report, Case No.: I-2019-002817.

```
DAMBLY STATED THAT HE MAY HAVE BEEN TARGETED BY "ANTIFA" DUE TO HIS AFFILIATION WITH THE "EUROPEAN
HERITAGE ASSOCIATION." HE STATED THAT A PRINCETON SCHOOL TEACHER, MARTHA FRIEND, HAD POSTED A PICTURE
OF HIS VEHICLE ON TWITTER THIS PAST NOVEMBER. HE ALSO STATED THAT ANOTHER TWITTER USER, KNOWN AS
"ANTIFASHGORDON", DOXXED HIM A FEW MONTHS AGO BY RELEASING HIS HOME ADDRESS, EMPLOYMENT DETAILS,
PICTURES OF HIS VEHICLE, AND A SATELLITE IMAGE OF HIS HOUSE TO TWITTER. HE BELIEVES THAT THE ACTOR USED
THIS INFORMATION TO FIND HIS VEHICLE AND SLASH HIS TIRES TO PREVENT HIM FROM DRIVING TO A SCHEDULED
PROTEST IN PRINCETON ON SATURDAY.

HE ALSO STATED THAT HE RECEIVED A TEXT THIS WEEKEND FROM AN UNKNOWN SUBJECT (732-744-4937) ASKING HIM,
"SO YOUR THING WENT WELL TODAY? DID YOU GUYS GET THERE OK?" HE BELIEVES THIS SUBJECT MAY HAVE BEEN
INVOLVED WITH DAMAGING HIS TIRES.
```

62.    Upon information and belief, on January 11, 2019, cellular phone number (732) 744-4937) described above in ¶ 63 left the message "any violence or blood spilled is also on your hands," that was captured by the New York Daily News as described in ¶ 58 above.

63.    Upon information and belief, cellular phone number (732) 744-4937 belongs to the person who controls and publishes Twitter account *@Nstricklanded*, who sent the below message to Exoo after the message described in ¶ 58 above was captured and sent D'Ambly the text message described at ¶ 63 above.



64.     On Sunday, January 13, 2019, Exoo, who had no connection to D'Ambly or Daily News, announced D'Ambly's termination to his associates twenty-four (24) hours before the Daily News claimed they learned of the threats that caused D'Ambly's termination.



65.     On January 16, 2019, during a phone conference with Brill, Nechvatal, and a Union representative, D'Ambly was played the recorded death threats and asked to identify the

caller. D'Ambly was unable to identify the caller, but said it was the behavior of "Antifa types." D'Ambly was terminated during this phone conference.

66.     On January 23, 2019, Patrick LoPresti, President of Local One-L informed the Daily News that they were appealing D'Ambly's termination pursuant to terms of the Contract.

67.     On or about January 25, 2019, D'Ambly received his "Termination of Employment" letter, signed by Brill, and dated January 22, 2019. The letter informed D'Ambly his termination was effective January 18, 2019. In the letter, Brill stated you "are being targeted by this group…" and "now our workplace and employees [are] at risk of counter attacks by Antifa." *See* Exhibit D, Termination of Employment letter dated January 22, 2019.

> You are being targeted by this group
> has now put our workplace and employees at
> risk of counter attacks by Antifa.

68.     The termination letter falsely stated the Daily News learned of the death threats on January 14, 2019, contrary to emails that confirm the Daily News learned of the threats on January 11, 2019.

> On Monday, January 14, 2019, we learned that two threatening voice-mails had been left on a Company voice-mail box on Friday, January 11, 2019, which caused our company to have serious concern for the safety of our employees.

---------- Forwarded message ----------
From: ████████ George" -███████@nydailynews.com>
To: ████████ Ed" <███████@tribpub.com>
Cc:
Bcc:
Date: Mon, 14 Jan 2019 19:33:44 +0000
Subject: FW: Voicemail from 7327444937

Ed,

This is the second message looks like the phone number is there.

George

From: Cisco Unity Connection Messaging System [mailto:████████@relay-int.tribune.com]
Sent: Friday, January 11, 2019 10:21 AM
To: ████████@relay-int.tribune.com
Subject: Voicemail from 7327444937

69.     In the termination letter, Brill claimed the death threats received on January 11, 2019, were the "cause" of D'Ambly's termination, because the death threats meant D'Ambly

"brought his activities" into the workplace, therefore, "we deem your actions to be work related and are terminating your employment for cause."

70.     At some point after January 23, 2019, the Union on behalf of D'Ambly filed a grievance with the American Arbitration Association, case number 01-19-0000-7178.  The Union retained attorneys Thomas Kennedy ("Kennedy") and Kate M. Swearengen ("Swearengen") of Cohen, Weiss, and Simon, LLP (collectively Kennedy, Swearengen and Cohen, Weiss and Simon, LLP shall be referred to as "CWS") to represent D'Ambly.

71.     Thereafter, D'Ambly had a phone conference with Kennedy to discuss the case.  D'Ambly was acquainted with Kennedy for approximately twenty years due to his Union activities.  D'Ambly explained the threats he received, property damage, and that his tires were slashed.  D'Ambly stated "Tom, this Antifa are terrorists…"  Kennedy angrily responded, "I do not consider Antifa to be terrorists and if you are going to continue referring to them (Antifa) as terrorists we are going to end this call."  Kennedy scoffed at D'Ambly's desire to have his employment reinstated at the Daily News.

72.      At some point thereafter, D'Ambly had his first case discussion phone conference with Kate Swearengen, who assumed representation.  Without prompting, Swearengen explicitly informed D'Ambly that "she doesn't agree with his politics, and she doesn't want to discuss them any further."  Like Kennedy, Swearengen dismissed D'Ambly's wish to have his employment reinstated.

73.     Kennedy and Swearengen's revulsion of D'Ambly directed their representation and they failed to adequately research basic facts favorable to D'Ambly's wish to be reinstated.  CWS ignored Brill's misrepresentation and veracity of the claimed "cause" of their client's termination.

74. CWS failed to adequately investigate the sources of the doxing campaign. Had CWS engaged in reasonable investigation of the source of the dox they would have discovered @AntiFashGordon's January 13, 2019, announcement that D'Ambly was terminated, which was one day before the Daily News claimed they learned of the "cause" of D'Ambly's termination.

75. On or about July 15, 2019, D'Ambly executed the "Separation Agreement and Mutual General Release" negotiated by CWS that paid D'Ambly a lump sum payment in exchange the Union would withdraw the pending arbitration case with prejudice.

76. As a result of Defendants' misconduct D'Ambly has suffered substantial personal and property damage and been severely financially harmed.

## ZACHARY REHL

77. Rehl repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 76 with the same force and effect as if set forth in detail herein again.

78. Exoo worked with Torch Antifa members to acquire Rehl's true personal identity and doxed him on or about August 2, 2017. Rehl was labeled a fascist and white supremacist, because he organized a "Back the Blue" rally to support Philadelphia police officers.

79. As in all cases, associates dogpiled Rehl's employer with calls, emails, and Tweets, and Rehl was terminated in or about September 2017.

80. On or about October 1, 2018, Rehl was doxed a second time when he organized the "We the People" rally that occurred in Philadelphia on November 17, 2018.



AntiFash Gordon
@AntiFashGordon                    ...

THREAD: Far-right groups are organizing a "We the People" rally in Philadelphia for Saturday, 11/17.

81.     On November 14, 2018, Exoo followed up Rehl's dox and incited his associates to disrupt the We the People rally, because "fascism is coming and only we can stop it."



82.     On November 16, 2018, Exoo further incited his followers against the We the People rally, by stating "the city granted rally permits to fascists, and the cops will be there to protect them" and reminded "Who protects us? We protect us."



83.     As a result of Exoo's incitement, November 17, 2018, at 12:41 a.m., the night before the rally, Torch Antifa took "direct action" against Rehl and threw a brick through the front window of Rehl's home and spray painted the word "Nazi" on his home as seen below.



84.    Exoo acknowledged media reports of the brick being thrown through Rehl's

window.



85.    The day of the We the People rally Torch Antifa attacked two Marine Reservists

that Torch Antifa they participated in the rally.



**CITY**

## Marines Were Attacked, Robbed Near "We the People" Rally in Philly

Police say these guys maced, punched, kicked, and robbed a group of Marine Corps reservists after calling them "Nazis" and "white supremacists."

by VICTOR FIORILLO  •  11/20/2018, 2:34 p.m.

The Philadelphia Police Department is asking for the public's help to identify a group of people accused of attacking multiple Marine Corps reservists last Saturday afternoon down the street from the "We the People" rally.

It happened around 3:20 p.m. on November 17th on the 100 block of South Front Street. According to police, the reservists were approached by a group of males and females, who called the reservists "Nazis" and "white supremacists."

30

**US NEWS**

## Antifa Member Charged in Assault of US Marines Near 'We the People' Rally in Philly: Reports

November 28, 2018 15:51, Last Updated: November 28, 2018 18:45

By Jack Phillips

Police arrested and charged a man believed to be the leader of an Antifa group in Philadelphia after a group of U.S. Marine reservists were assaulted on Nov. 17.

**CITY**

## Philly Antifa Activist Tom Keenan Charged in Assault on Marines

The alleged attack occurred on November 17th near the "We the People" rally.

*by* **VICTOR FIORILLO** • 11/26/2018, 1:44 p.m.

Tom Keenan, 33, of Mount Airy, turned himself into the police department several days ago after investigators released a video that appeared to show him and two others yelling at a group following a rally in Philadelphia, Fox News reported.

86.     Three members of Torch Antifa were arrested and have been charged with various felonies, including aggravated assault, ethnic intimidation, and conspiracy related to the attack.

**CITY**

## D.C. "Antifa Leader" Is Third Man Charged in Marine Attack in Philadelphia

Joseph Alcoff has been charged with aggravated assault, ethnic intimidation, and conspiracy, among other offenses.

*by* **VICTOR FIORILLO** • 1/29/2019, 9:55 a.m.

The Philadelphia District Attorney's Office has charged 37-year-old Washington, D.C., resident Joseph Alcoff with aggravated assault, ethnic intimidation, and conspiracy — all felonies — among other charges. He has pleaded not guilty and is currently out on bail.

Alcoff joins codefendants **Tom Keenan** and **Thomas Massey** in the case. Both Keenan and Massey were arrested at the end of November and are also out on bail awaiting trial.

### <u>AMANDA REHL</u>

87.     AmRehl repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 86 with the same force and effect as if set forth in detail herein again.

88.     On or about August 2, 2017, Exoo conspired with Torch Antifa to dox AmRehl's home address when he doxed her husband, Zachary Rehl.

89.     On or about October 1, 2018, AmRehl's home address was doxed a second time when Exoo doxed her husband Zachary Rehl, because he organized the "We the People" march in Philadelphia that occurred on November 17, 2018.

90.     On November 14, 2018, Exoo directed his associates to counter protest and disrupt the We the People the event, because "fascism is coming and only we can stop it."

31

91.     At 12:41 a.m. on November 17, 2018, AmRehl's safety was endangered when she was assaulted by Torch Antifs who threw a brick through the front window of AmRehl's home and spray painted the word "Nazi" on the front of her home as seen below with a copy of the Philadelphia Police Incident Report.





**K.R., a minor, by and through her father ZACHARY REHL and mother AMANDA REHL**

92.     K.R. repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 92 with the same force and effect as if set forth in detail herein again.

93.     On or about August 2, 2017, Exoo and Torch Antifa doxed K.R.'s home address when he doxed her father, Zachary Rehl.

94.     On or about October 1, 2018, K.R.'s home address was doxed a second time when Exoo doxed K.R.'s father Zachary Rehl, because he organized the "We the People" march in Philadelphia that occurred on November 17, 2018.

95.     On November 14, 2018, Exoo directed his associates to counter protest and disrupt the We the People event, because "fascism is coming and only we can stop it."

96.     At 12:41 a.m. on November 17, 2018, K.R.'s safety was endangered when she was assaulted by Torch Antifa who threw a brick through the front window of her home and spray painted the word Nazi on the front of her home.



**AARON WOLKIND**

97.     Aaron Wolkind repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 96 with the same force and effect as if set forth in detail herein again.

98.     Exoo conspired with members of Torch Antifa to obtain Wolkind's true personal identity and doxed him on or about June 21, 2019. Wolkind was called a fascist, white supremacist, and Nazi, which is an idiotic assertion, because Aaron's a Jew.

 AntiFash Gordon @AntiFashGordon · Jun 21, 2019                    ...
Philly Proud Boy Sgt-at-arms Aaron **Wolkind** is employed as a Technical
Support Specialist at @AerzenUSA, in Coatesville, PA.

99.     On July 3, 2019, Exoo re-posted Wolkind's dox and associates dogpiled

Wolkind's employer Aerzen USA ("Aerzen") social media accounts and internet profiles and

dogpiled his employer and co-workers with phone calls and emails.

100.     To their credit, Aerzen did not immediately terminate Wolkind, but when

enterprise associates discovered Wolkind was not terminated, Exoo and associates dogpiled

Aerzen's clients demanding they stop doing business Aerzen and dogpiled Aerzen's subsidiaries

101.     On or about November 17, 2019, Torch Antifa became angered that a tavern in

Philadelphia allegedly owned by a family member of Zach Rehl allegedly allowed Wolkind to

distribute literature inside the tavern, so they encouraged dogpiling on Wolkind's employer.



102.     On November 18, 2019, Exoo published Wolkind's dox and reminded associates

to "Use *67 to block your number."



103.    Torch Antifa dogpiled a tavern, because they believed Wolkind distributed literature at the tavern.



104.    On or about November 19, 2018, based on Torch Antifa's belief that Wolkind was affiliated with the tavern, the tavern "got the smash," which meant its windows were broken.



105.    Torch Antifa vandalized the tavern a second time on January 1, 2021, based on their belief that Wolkind was affiliated with the tavern and their damage derogatorily referenced the Proud Boys.



106. As a result, Wolkind's November 18, 2019, dox and subsequent dogpiling, his employer blocked Twitter users and temporarily shut down their social media and internet profiles, and closes a Coatesville, Pa. facility for one day.



107. Wolkind continues to receive threatening and harassing phone calls due to the dox, which identifies him as a white supremacist and a Nazi, but as stated above Aaron's a Jew.

## STEVE HARTLEY

108.     Hartley repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 107 with the same force and effect as if set forth in detail herein again.



109.     Hartley's employer information and home address were doxed and dogpiled on November 29, 2018, and labeled a Nazi, racist, terrorist and a threat to women and minorities.



110.     Exoo partnered with Torch Antifa to dox Hartley, who dogpiled Hartley'employer and co-workers with negative posts and reviews.



111. Following his dox Torch Antifa members caused damage to Hartley's home, which is what they consider to be self-protection.

## **MARK ANTONY TUCCI**

112. Tucci repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 112 with the same force and effect as if set forth in detail herein again.

113. Exoo worked with Torch Antifa members to dox Tucci on December 10, 2018. Associates called Tucci's employer more than 600 times and shut it down.

114. In real time you can see the enterprise's conspiracy play out in their Tweets, Exoo picked up when his Torch Antifa partner got temporarily banned.



a. Enterprise associates who called Tucci's employer, Tweeted confirmation.



115.     Exoo would not let his associates relent until Tucci's employer publicly

announced his termination.



116.     The following day Exoo directed associates to continue dogpiling.



## **RICHARD SCHWETZ**

117.     Schwetz repeats and realleges the facts pertinent to all plaintiffs as alleged above

in paragraphs 1 through 116 with the same force and effect as if set forth in detail herein again.

118.    The enterprise targeted Schwetz after he volunteered to clean up debris and litter at a Clean Up America event that occurred in Philadelphia on May 23, 2020.

119.    Schwetz was doxed in June 2020 by an Exoo associate, but it failed to deliver as intended.



120.    Exoo doxed Schwetz on September 21, 2020, with detailed information and a statement that we do not cry to cops or the courts.



## **MATTHEW REIDINGER**

121.    Reidinger repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 120 with the same force and effect as if set forth in detail herein again.

122.    Exoo and Torch Antifa conspired to dox Reidinger.



123.    As is the case with all victims, Exoo and associates dogpiled Reidinger's

employer.



124.    In his instructions Exoo instructed associates to dogpile Reidinger's employer in

order to cause his termination as they successfully had done to a Comcast employee.



## JOBEL BARBOSA

125.    Barbosa repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 124 with the same force and effect as if set forth in detail herein again.

126.    Exoo conspired with Torch Antifa to dox Barbosa's identity and employer's information on June 22, 2019, which dox was promoted by comedienne Kathy Griffin.



127.    Barbosa is an olive-skinned Puerto Rican, who was immediately called into a meeting with a company executive and a human resource's representative and interrogated about being a white supremacist.

128.    Exoo and associates did not know Barbosa was terminated on June 27, 2019, so they reposted his information on July 1, 2019, with his employer's corporate office contacts.



129.    As is the custom, associates Tweeted confirmation of contacts with Barbosa's employer to Exoo.



130.    Associates' confirmation to Exoo included implied violence against Barbosa.



131. Barbosa's home address and cell phone numbers for him and his wife were posted to phonezapp.noblog.org (no longer available) and Barbosa's wife received threatening calls on her personal cell phone.

## SEAN-MICHAEL DAVID SCOTT

132. Scott repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 131 with the same force and effect as if set forth in detail herein again.



134.    On the same day as the dox was published, Torch Antifa posted flyers near

Scott's home and caused property damage and painted it with graffiti.  As a result of the property

damage, Scott's property manager forced him to break his lease and immediately vacate in order

to avoid further property damage that was threatened by Torch Antifa dogpilers.



135.    Exoo and Torch Antifa caused Scott's termination from a second employer.



136.    On or before April 15, 2020, Torch Antifa identified Scott's car and his tires were slashed, and although not seen in photo below, his passenger windows were broken.  Torch Antifa mocked Scott's damaged car as seen in photos below.



### **JOHN HUGO**

137.    Hugo repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 136 with the same force and effect as if set forth in detail herein again.

138.    Hugo was doxed by Exoo on January 2, 2020, and Exoo has admitted he threatens Boston area "fash" like Hugo.



139.    A second dox occurred in February 2020 that led to Hugo being terminated in March 2020.



140.    Hugo continues to receive harassing phone calls from enterprise associates on a near daily basis.[20]

## SUPPLEMENTAL PLEADING TO ADD PLAINTIFF THOMAS LOUDEN WHO WAS INJURED BY THE ENTERPRISE AFTER THE COMPLAINT WAS FILED

141.    Louden repeats and realleges the facts pertinent to all plaintiffs as alleged above in paragraphs 1 through 140 with the same force and effect as if set forth in detail herein again.

142.    The original Complaint in this action was filed on September 21, 2020, and Louden was injured after the Complaint was filed in the same series of occurrences or transactions.

143.    Louden was employed as the Director of Managed Care at Thomas Jefferson University Hospital in Philadelphia.

---

[20] Voicemail recordings are provided on thumb drive that was submitted to the Court and defendants.

144.    During a global health emergency and pandemic Exoo doxed and dogpiled Louden's hospital employer on November 2, 2020, because of the employer's decision concerning an illegal alien's immigration status.



145.    Louden does not have a Twitter account was unaware of Exoo's dox until he was called to a Zoom meeting with his employer's Vice-President and a human resources representative on November 2, 2020.  Louden was quizzed about his membership in a right-wing extremist group.  Louden is a 30-year volunteer firefighter and the appointed Deputy Emergency Management Coordinator for Hilltown Township, Pa.

146.    On November 3, 2020, Louden learned that Exoo posted photos of his home.

147.    On November 10, 2020, Exoo re-posted Louden's personal information with explicit directions, including photographs of his home and local street signs, the name of the city, and longitude and latitude coordinates.



## CLAIMS FOR RELIEF

## COUNT I

**Violation of New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to – 49
(as to D'Ambly against Tribune Publishing Company and the New York Daily News)**

148.    D'Ambly realleges and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 147 with the same force and effect as if set forth in detail herein again.

149.    Defendants Tribune and Daily News are employers as defined in N.J.S.A. 10:5-5.

150.    D'Ambly is older than forty years (40) old and was an employee as defined in N.J.S.A. 10:5-5.

151.    Defendants Tribune and Daily News discharged D'Ambly due to their enmity towards D'Ambly's racially identifiable associations, whereas, non-white Tribune and Daily News employees who participate in racially identifiable associations, are not punished, or terminated, violated N.J.S.A. 10:5-12.

152.    Defendants Tribune and Daily News undertook several pre-textual steps to mask D'Ambly's discriminatory termination:

    a.    Tribune hired a private investigation firm to invade D'Ambly's privacy in an unsuccessful effort to catch D'Ambly engaged in unlawful activity.

    b.    In the morning of January 11, 2019, the Daily News received death threats intended to extort D'Ambly's termination that they did not immediately disclose, because they intended to use the threats pre-textually as the "cause" of D'Ambly's termination.

    c.    In the afternoon of January 11, 2019, the Daily News issued D'Ambly a "Last and Final Warning," that warned D'Ambly he would be immediately terminated if it

were discovered he brought his political activities into the workplace, but they did

not inform or warn D'Ambly of the death threats earlier received.

d.   D'Ambly was informed he was terminated on January 16, 2019.

e.   Subsequently, D'Ambly received a "Termination of Employment" letter dated

January 22, 2019, whereby, the Daily News falsely stated they discovered the

death threats on January 14, 2019, contrary to indisputable evidence they received

the death threats on January 11, 2019, which meant he "brought his activities into

the workplace" after he was warned.  Daily News cited this fabrication as the

"cause" of D'Ambly's termination.

153.   As a direct and proximate result of defendants Tribune Publishing Company and

the New York Daily News racially discriminatory termination, D'Ambly has suffered adverse

consequences and continues to be damaged.  D'Ambly is entitled to compensatory damages,

equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an

amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT II

**Tortious Interference with Prospective Economic Benefit**
**(as to all Plaintiffs except K.R. against defendant Christian Exoo a/k/a "AntiFashGordon")**

154.   Plaintiffs reallege and incorporate herein by reference each and every one of the

allegations contained in paragraphs 1 through 153 with the same force and effect as if set forth in

detail herein again.

155.   Plaintiffs were rightfully entitled to pursue lawful employment.

156.   Plaintiffs reasonably expected their employment to continue into the future and to

benefit economically from his employment.

157.    Defendant Exoo knew Plaintiffs were employed and intentionally interfered with their prospective economic benefits to be gained from continued employment.

158.    Defendant Exoo intentionally and unjustifiably interfered with Plaintiffs rights to pursue lawful business.

159.    Defendant Exoo's interference caused Plaintiffs' employers to terminate their employment.

160.    Plaintiffs have suffered and will continue to suffer irreparable harm in the form of damage to his reputation, loss of income and financial hardship as a result of Exoo's interference.

161.    As a direct and proximate result of defendant Exoo's interference with Plaintiffs prospective economic benefits, Plaintiffs have suffered adverse consequences and continue to be damaged.  Plaintiffs are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT III

### Employer's Breach of its Duty to Warn
### (as to D'Ambly against defendants Tribune Publishing Company and the New York Daily News)

162.    D'Ambly realleges and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 161 with the same force and effect as if set forth in detail herein again.

163.    Defendants Tribune and Daily News received a stream of death threats directed at D'Ambly over a two and one-half month period, but they never warned D'Ambly.

164.     Defendants Tribune and Daily News never warned D'Ambly to take precautionary measures as he entered or exited the workplace.

165.     Defendants Tribune and Daily News did not take steps to increase the safety of D'Ambly and other employees as they entered and exited the workplace.

166.     Defendants Tribune and Daily News did not secure the workplace in order to protect D'Ambly and others.

167.     As he was not aware of the threats, D'Ambly could not take steps to protect himself and his property and as a result his property was damaged on January 11, 2019.

168.     Defendants Tribune and Daily News had a duty to warn their employee he was the direct target of the death threats they received.

169.     As a direct and proximate result of defendants Tribune and Daily News' failure to warn D'Ambly has suffered adverse consequences and continues to be damaged.  D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## **<u>COUNT IV</u>**

**Violations of 18 U.S.C. §§ 1962(c) – Racketeering**
**Multiple violations of RICO predicates 18 U.S.C. §§ 1951 and 1952**
**(as to all Plaintiffs against defendants Christian Exoo a/k/a "AntiFashGordon," St. Lawrence University, Vijaya Gadde, and Twitter, Inc., the "Exoo Enterprise")**

170.     Plaintiffs reallege and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 169 with the same force and effect as if set forth in detail herein again.

171.   Each of the individuals and entities is a "person" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

172.   Defendant Christian Exoo leads and conspires with associates, including Defendant Torch Antifa Network in an enterprise as defined by 18 U.S.C. 1961(4).

173.   At all times relevant, Gadde was the only Twitter employee authorized to permanently ban Twitter users.[21]

174.   Upon information and belief, Exoo's activities are well known to his employer St. Lawrence University, who have not taken steps to prevent their employee from harming others from his place of employment, because their share his goals.

We are witnessing a resurgence of the most dangerous and hateful legacy of our nation's history—white nationalism. The Southern Poverty Law Center, New York State, and because of the diversity our students, staff, and faculty bring to the table. White nationalism seeks to erode this through a discourse of fear, hatred, and xenophobia. It seeks to create a concept of America that is built on white supremacy and the dis-mantling of the work of social justice and equality that have been the hall-mark of this country for the last forty years. We will stand up for the rights of our students, faculty, and staff.

175.   Exoo uses his employment and lecturing at St. Lawrence to recruit.

---

[21] *Meet Vijaya Gadde, an Indian-born Twitter head who decides on blocking tweets, users*, The Economic Times, (Jan. 16, 2020) https://economictimes.indiatimes.com/tech/internet/meet-vijaya-gadde-an-indian-born-twitter-head-who-decides-on-blocking-tweets/articleshow/73281445.cms, (last accessed September 12, 2020).  See also, *Twitter's Top Lawyer Is Final Word On Blocking Tweets – Even Donald Trump's,* Bloomberg.com,(Jan. 15, 2020)  https://www.bloomberg.com/news/articles/2020-01-15/twitter-s-gadde-is-final-word-on-blocking-tweets-even-trump-s, last accessed September 12, 2020; *Meet Twitter's top lawyer, who has the final word on blocking tweets – including Donald Trump's,* Fortune.com, (Jan. 15, 2020) https://fortune.com/2020/01/15/twitter-top-lawyer-vijaya-gadde-blocks-tweets-donald-trump/, (last accessed September 12, 2020).



176.    Exoo is and was well known to Gadde and Twitter as a ban evader before and during the time of Plaintiffs' dox.



177.    Upon information and belief Gadde and Twitter Support have received complaints regarding @AntiFashGordon's doxing and social coordination, examples below.





178.    In or about September 2019, Exoo was suspended for posting confidential
information of others, otherwise known as doxing, but reinstated weeks later.



179.    Twitter has complete control over who is allowed an account, and as a
permanently banned user Exoo could not possess an account without Twitter's consent or
agreement when he was allowed to change his ban evasion account username from @DoxSavage
to @AntiFashGordon.[22]



180.    Exoo is connected to Twitter through his association with the account holder of
@emilygorcenski, who has leveraged a connection to Jack Dorsey to have accounts that use
"deadnames" banned, as seen in the image below.

---

[22] Video recording of Twitter executives confirming permanent Twitter bans are lifetime bans submitted to the Court
on a thumb drive.



181.    Gadde and Twitter have classified alleged white supremacists as a greater threat than drug cartels or Islamic terrorists, and Exoo and associates doxing benefits her publicly stated opposition to white supremacists, which she is "very, very focused on that…the KKK, the American Nazi Party," because that "was what my parents had to deal with" where she grew up on the Texas-Louisiana border.[23]

182.    Exoo and associates conduct activities that affects interstate commerce by threatening violence to persons and property and causing actual violence to persons and property.

183.    Defendants directed and participated in patterns of racketeering activity, including multiple acts indictable under 18 U.S.C. §§ 1951 (Interference with commerce by threats or violence) and 1952 (use of interstate facilities to conduct unlawful activity), including using

---

[23] *Twitter's Kayvon Beykpour and Vijaya Gadde: the Code Conference interview (transcript)*, Vox.com (June 27, 2019) https://www.vox.com/recode/2019/6/27/18760444/twitter-kayvon-beykpour-vijaya-gadde-kara-swisher-peter-kafka-code-conference-interview-transcript, last accessed September 12, 2020.

interstate communications to order violent acts against all plaintiffs, specifically, D'Ambly, Rehl, Wolkind, and Scott.

184.    The conduct of the Exoo and associates described above constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).  Defendants' decisions and activity routinely conduct its transactions in such a manner constitutes "patterns of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

185.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are liable to Plaintiffs for three times the damages sustained, plus the costs of this suit, including reasonable attorneys' fees.

186.    As a direct and proximate result of Defendants patterns of racketeering activity Plaintiffs have suffered adverse consequences and continue to suffer adverse consequences in an amount to be determined at trial, but which is in excess of $75,000.00.  Plaintiffs are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT V

**Violation of 18 U.S.C. § 1962(d) (Conspiracy)**
**(as to all Plaintiffs against defendants Christian Exoo a/k/a "AntiFashGordon," St. Lawrence University, Vijaya Gadde, and Twitter, Inc., the "Exoo Enterprise")**

187.    Plaintiffs reallege and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 186 with the same force and effect as if set forth in detail herein again.

188.    Section 1962(d) of RICO provides "shall be unlawful for any person to conspire to violate any provisions of subsection (a), (b), or (c) of this section."

189.     Defendants have violated 18 U.S.C. § 1962(d) by conspiring to associate and participate in the Exoo Enterprise's patterns of racketeering activities as defined in 18 U.S.C. 1962(c).

190.     Defendants' have engaged in overt and predicate racketeering acts in furtherance of the conspiracy, including using interstate communications to threaten, intimidate and commit violent acts against their targets.

191.     The nature of the above-described acts of Defendants in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. 1962(d) violation, but they were aware that their ongoing acts have been, and are part of an overall pattern through related and continuous acts.

192.     Defendants sought to and have engaged in the commission of, and continue to commit overt acts, including the following unlawful racketeering predicate acts:

    a.     Multiple instances of interference with commerce by threats of violence in violation of 18 U.S.C. § 1951; and

    b.     Multiple instances of use of interstate facilities to conduct unlawful activity violations of 18 U.S.C. § 1952.

193.     As a direct and proximate result of Defendants' multiple overt acts and predicate acts in furtherance of an enterprise in violation of 18 U.S.C. § 1962(d), by conspiring to violate 18 U.S.C. 1962(c), D'Ambly has been and continues to be injured by Defendants' conduct.

194.     By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are liable to D'Ambly for three times the damages sustained, plus the costs of this suit, including reasonable attorneys' fees.

195.     As a direct and proximate result of Defendants patterns of racketeering activity Plaintiffs have suffered adverse consequences and continue to suffer adverse consequences in an amount to be determined at trial, but which is in excess of $75,000.00.  Plaintiffs are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT VI
## Legal Malpractice

### (as to D'Ambly against defendant Cohen, Weiss, and Simon, L.L.P.)

196.     D'Ambly repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 195 with the same force and effect as if set forth in detail herein again.

197.     As a result of their personal revulsion of D'Ambly and his political beliefs CWS failed to adequately represent and protect D'Ambly's rights.

198.     Defendant CWS neglected to perform necessary case research, legal research, and investigation of the accusations against D'Ambly.

199.     As a result of CWS's inadequate legal research and investigation they failed to protect D'Ambly from the extortionate and criminal conduct of others.

200.     As a result of CWS's failure to adequately investigate D'Ambly's doxing they failed to learn that @AntiFashGordon publicly announced D'Ambly's termination on January 13, 2019, which occurred five days before his official termination date, and one day before the purported "cause" of his termination was discovered.

201.     CWS failed to challenge Brill's blatant misrepresentations regarding the timing of the alleged 'cause' of D'Ambly's termination.

202. CWS's revulsion of D'Ambly and his political beliefs caused them to ignore an obvious racially discriminatory pre-textual termination spotlighted by the private investigation, last and final warning, and falsely claimed cause of D'Ambly's termination.

203. As a direct and proximate result of CWS's legal malpractice that flowed from their firmwide enmity of D'Ambly's political beliefs D'Ambly has suffered adverse consequences and continues to be damaged. D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## COUNT VII

**Deprivation of Rights under *Section 610* of the Labor-Management Relationship Disclosure Act (LMRDA), 18 U.S.C. § 530**

**(as to D'Ambly against defendants Christian Exoo a/k/a "AntiFashGordon," St. Lawrence University, Vijaya Gadde, Twitter, Inc., "Exoo Enterprise")**

204. D'Ambly repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 203 with the same force and effect as if set forth in detail herein.

205. Under *Section 610* of the *Labor-Management Relationship Disclosure Act* ("*LMRDA*"), *18 U.S.C. §530*:

> It shall be unlawful for any person through the use of force or violence, or threat of the use of force or violence, to restrain, coerce, or intimidate, or attempt to restrain, coerce, or intimidate any member of a labor organization for the purpose of interfering with or preventing the exercise of any right to which he is entitled under the provisions of this Act [LMRDA].

206. As a result of the acts described herein, D'Ambly was forced into early unexpected retirement. He was a printing press platemaker, and his union does not have a Union

Hall where he can go shape to obtain new union printing jobs, moreover, his trade has been significantly depressed by technology.

207. D'Ambly's job has deprived him of his intangible property rights as a union member, and the economic benefits that flow therefrom, for the reason that his job loss has had the impact of an expulsion from the Teamsters.

208. On or about October 29, 2018, Exoo and associates dogpiled Daily News and the Teamsters intending to prevent D'Ambly from exercising his rights provided by the LMRDA.



209. Exoo and associates, such as those who caused property damage at D'Ambly's home, intentionally intimidated others with threats, such the phrase any "blood spilled" to deprive D'Ambly his union member rights.



210.    On January 13, 2019, when Exoo announced D'Ambly's termination the Teamsters were the only party capable of telling Exoo that D'Ambly was terminated, because the Daily News did not learn of the cause of D'Ambly's termination until January 14, 2019.

211.    As a direct and proximate result of Exoo and associates' dogpiling that threatened violence, use of force, and "any blood spilled" D'Ambly has been deprived of his intangible property rights provided to him under the LMRDA.  D'Ambly has suffered adverse consequences and continues to be damaged.  D'Ambly is entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees in an amount to be determined at trial, but which is in excess of $75,000.00.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

1.    Demands judgment against Defendants, jointly and severally, in an amount to be determined at trial plus interest, including, but not limited to, all emotional distress, back pay,

punitive damages, liquidated damages, statutory damages, attorneys' fees, costs, and disbursements, and for such relief as the Court deems just and proper.

2.      On Plaintiffs' RICO claims: compensatory damages and enhancement of damages Plaintiffs have sustained as a result of Defendants' conduct as may be permitted under the relevant statutes, such amount to be determined at trial, plus Plaintiffs costs in this suit, including reasonable attorneys' fees.

3.      On Plaintiffs' tortious interference, intrusion upon seclusion, stalking and harassment claims: compensatory and punitive damages in an amount to be determined at trial.

4.      On D'Ambly's State claims against the Tribune and Daily News: compensatory damages and enhancement of damages he sustained as a result of the Tribune and Daily News' conduct as may be permitted under the relevant statutes, such amount to be determined at trial, plus Plaintiffs costs in this suit, including reasonable attorneys' fees.

5.      On D'Ambly's legal malpractice claim: compensatory damages to be determined at trial.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury on all issues so triable.

Respectfully Submitted,
**LAW OFFICE OF PATRICK TRAINOR**
*Attorney for Plaintiffs*

Dated: November 30, 2021

Patrick Trainor
19 Union Avenue, Suite 201
Rutherford, New Jersey 07070
(201) 777-3327
pt@ptesq.com

# EXHIBIT C

Patrick Trainor, Esquire (Attorney ID 242682019)
**LAW OFFICE OF PATRICK TRAINOR, ESQ., LLC**
19 Union Avenue, Suite 201
Rutherford, New Jersey 07070
P: (201) 777-3327
F: (201) 896-7815
pt@ptesq.com
*Attorney for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DANIEL D'AMBLY; AARON WOLKIND; STEVE HARTLEY; RICHARD SCHWETZ; JOBEL BARBOSA; MATTHEW REIDINGER; JOHN HUGO; SEAN-MICHAEL DAVID SCOTT; THOMAS LOUDEN; ZACHARY REHL; AMANDA REHL; K.R., a minor, by and through her father ZACHARY REHL and her mother AMANDA REHL, MARK ANTHONY TUCCI, | CIVIL ACTION NO.: 2:20-cv-12880-JMV-JSA **REQUEST FOR ENTRY OF DEFAULT** |
| Plaintiffs, | |
| vs. | |
| CHRISTIAN EXOO a/k/a ANTIFASH GORDON; ST. LAWRENCE UNIVERSITY; TRIBUNE PUBLISHING COMPANY, LLC; NEW YORK DAILY NEWS; VIJAYA GADDE; TWITTER, INC; COHEN, WEISS AND SIMON, LLP; NICK STRICKLAND; TORCH ANTIFA NETWORK; UNNAMED ASSOCIATES 1 – 100, | |
| Defendants. | |

TO:    William T. Walsh
        Clerk, United States District Court
        District of New Jersey
        Martin Luther King Building
        & U.S. Courthouse
        50 Walnut Street, Room 4015
        Newark, New Jersey 07101

It is hereby requested that you enter the default of defendant TORCH ANTIFA NETWORK for failure to plead or otherwise defend in the above-captioned matter as provided by the Federal Rules of Civil Procedure.

**LAW OFFICE OF PATRICK TRAINOR, ESQ., LLC**
*Attorneys for Plaintiff*

Dated: May 6, 2022

_____
PATRICK TRAINOR, ESQ.

Patrick Trainor, Esquire (Attorney ID 242682019)
**LAW OFFICE OF PATRICK TRAINOR, ESQ., LLC**
19 Union Avenue, Suite 201
Rutherford, New Jersey 07070
P: (201) 777-3327
F: (201) 896-7815
pt@ptesq.com
*Attorney for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DANIEL D'AMBLY; AARON WOLKIND; STEVE HARTLEY; RICHARD SCHWETZ; JOBEL BARBOSA; MATTHEW REIDINGER; JOHN HUGO; SEAN-MICHAEL DAVID SCOTT; THOMAS LOUDEN; ZACHARY REHL; AMANDA REHL; K.R., a minor, by and through her father ZACHARY REHL and her mother AMANDA REHL, MARK ANTHONY TUCCI, <br><br> Plaintiffs, <br><br> vs. <br><br> CHRISTIAN EXOO a/k/a ANTIFASH GORDON; ST. LAWRENCE UNIVERSITY; TRIBUNE PUBLISHING COMPANY, LLC; NEW YORK DAILY NEWS; VIJAYA GADDE; TWITTER, INC; COHEN, WEISS AND SIMON, LLP; NICK STRICKLAND; TORCH ANTIFA NETWORK; UNNAMED ASSOCIATES 1 – 100, <br><br> Defendants. | CIVIL ACTION NO.: 2:20-cv-12880-JMV-JSA <br><br> **AFFIDAVIT OF DEFAULT** |

I, PATRICK TRAINOR, of full age, hereby deposes and says:

1.　　I am an attorney-at-law of the State of New Jersey and associated with the firm of

the Law Office of Patrick Trainor, Esq., LLC, attorney for Plaintiffs in the above-entitled action.

As such, I am authorized to make the instant Affidavit on behalf of the Plaintiffs in this case.

2.      On December 4, 2021, a process server, who does not have a direct interest in this litigation, acting on behalf of Plaintiff and its counsel, successfully served defendant TORCH ANTIFA NETWORK with a Summons in a Civil Action and a copy of the Verified Complaint at 383 Hillcrest Avenue, Somerset, NJ 08873.  Copies of the process server's Return of Service and the Summons are attached hereto as **Exhibit A**.

3.      Defendant TORCH ANTIFA NETWORK is an unincorporated association that does not have any known physical addresses or registered agents where personal service can be completed.  However, the Internet Corporation for Assigned Names and Numbers ("ICANN") registry identifies One People's Project as the owner and registrant of defendant's internet domain *https://torchantifa.org,* and also the technical, administrative, and billing contact with a New Jersey mailing address.  One People's Project is an approved IRS 501(c)(3) based in New Brunswick, NJ.

4.      One People's Project has listed and does list 383 Hillcrest Avenue, Somerset, NJ 08873 as its business address in annual tax filings submitted to the Internal Revenue Service. Further, One People's Project's founder and only known employee, resides at 383 Hillcrest Avenue, Somerset, New Jersey 08873.

5.      The time within which the said defendant may answer or otherwise move as to the Verified Complaint has expired and has not been extended or enlarged.  The defendant named herein has not answered or otherwise moved or defended the action.

6.      I certify under penalty of perjury that the foregoing is true and correct.

Dated:  May 6, 2022                              _____
                                                PATRICK TRAINOR

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**DANIEL D'AMBLY,**
*Plaintiff*

V.

**CHRISTIAN EXOO, ET AL.,**
*Defendant*

**SUMMONS IN A CIVIL CASE**

CASE
NUMBER: **2:20−CV−12880−JMV−JAD**

TO: *(Name and address of Defendant):*

Torch Antifa Network
c/o One People's Project
383 Hillcrest Avenue
Somerset, NJ 08873

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States Agency, or an office or employee of the United States described in Fed. R. civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

**s/ WILLIAM T. WALSH**
CLERK



**ISSUED ON 2020−09−21 16:00:34**, Clerk
USDC NJD

## RETURN OF SERVICE

| Service of the Summons and complaint was made by me[1] | DATE |
|---|---|
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served: _____

_____

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and

discretion then residing therein.

☐ Name of person with whom the summons and complaint were left:_____

☐ Returned unexecuted:_____

_____

_____

☐ Other (specify) :_____

_____

_____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information

contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____          _____

                    Date                                          *Signature of Server*

                                                    _____

                                                    *Address of Server*

DocuSign Envelope ID: 94392EF5-4414-4556-AC11-7FA5C87DFAAA

20211203113933

| AO 440 (Rev. 06/12) Summons in a Civil Action | **RETURN OF SERVICE** |
|---|---|

SERVICE OF: **SUMMONS, SECOND AMENDED COMPLAINT**
EFFECTED (1) BY ME: **NUNO VEIGA**
TITLE: **PROCESS SERVER**

DATE: **12/4/2021 11:10:45 AM**

---

CHECK ONE BOX BELOW TO INDICATE APPROPRIATE METHOD OF SERVICE:

[ ] Served personally upon the defendant

TORCH ANTIFA NETWORK C/O ONE PEOPLE'S PROJECT

Place where served:

383 HILLCREST AVENUE    SOMERSET  NJ  08873

[ ] Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein. Name of person with whom the summons and complaint were left:

IONA JENKINS

Relationship to defendant    **PERSON AUTHORIZED TO ACCEPT SERVICE**

Description of Person Accepting Service:

SEX: F___ AGE: 51-65_ HEIGHT: 5'4"-5'8"___ WEIGHT: 161-200 LBS.___ SKIN: BLACK____ HAIR: GRAY____ OTHER: _____

[X] To the best of my knowledge, said person was not engaged in the U.S. Military at the time of service

---

**STATEMENT OF SERVER**

TRAVEL$ _____.____              SERVICES $_____.____              TOTAL $_____.____

---

**DECLARATION OF SERVER**

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in this Return of Service and Statement of Server is true and correct.

Docusign Court Approved E-Signature

DATE: __12/04/2021__              *NUNO VEIGA*
                                  E6FA2FE31256452              L.S.

SIGNATURE OF NUNO VEIGA
GUARANTEED SUBPOENA SERVICE, INC.
2009 MORRIS AVENUE
UNION, NJ 07083

ATTORNEY:       PATRICK TRAINOR, ESQ.
PLAINTIFF:      DANIEL D'AMBLY, ET AL
DEFENDANT:      CHRISTIAN EXOO, ET AL
VENUE:          DISTRICT
DOCKET:         2 20 CV 12880 JMV JSA
COMMENT:        DARELL JENKINS IS OWNER

# EXHIBIT D

DECEMBER 16, 2020

eff.org



# Doxxing: Tips To Protect Yourself Online & How to Minimize Harm

"Doxxing" is an eerie, cyber-sounding term that gets thrown around more and more these days, but what exactly does it mean? Simply put, it's when a person or other entity exposes information about you, publicly available or secret, for the purpose of causing harm. It might be information you intended to keep secret, like your personal address or legal name. Often it is publicly available data that can be readily found online with just a bit of digging, like your phone number or workplace address.

By itself, being doxxed can be dangerous, as it may reveal information about you that could harm you if it were publicly known. More often it is used to escalate to greater harm such as mass online harassment, in-person violence, or targeting other members of your community. Your political beliefs or status as a member of a marginalized community can amplify these threats.

Although you aren't always faced with the option, taking control of your data and considering precautionary steps to advance your personal security are best done before you're threatened with a potential doxxing. Privacy does not work retroactively. A great place to start is to develop your personal threat model. After you've done that, you can take specific measures to advance your data hygiene.

## First Steps To Protect Yourself

First: **Take a look at the information that is already publicly available about you online.** This is as simple as opening up a search engine and entering your name/nickname/handle/avatar and seeing what comes up. It's common to be

overwhelmed by what you find: there can be much more data about you than you expected readily available online to anyone that cares to do a little digging. Remind yourself that this is normal, and that you are on your way to reducing that information and taking the necessary steps to protecting yourself. Take note of any pieces that strike you as high priority to deal with. Keep track both of what the information is and where you found it.

Second: **Identify who you can trust with your secrets.** Friends, family, chosen family? If you are fearful of being doxxed, you'll want to speak with these people directly. Not only because they can be implicated in a doxxing incident, but also because there is strength in your community. These trusted folks can help you plan how to prevent an incident from happening, and also what to do in the event of one (more on that below). Keep in mind that this list will change over time. It's natural for relationships to ebb and flow, and so will the amount of trust you ascribe them with. Set a reminder for yourself to check in on this list once a year or so.

Set some data sharing community ground rules such as asking for permission before taking/posting photos, refraining from geotagging those photos, or using code words to imply something else that only trusted people know. These are all examples of steps you can take to strengthen your social community's security posture.

Third: **Read up on the policies your online accounts have.** Most major social media platforms and other popular web apps have policies and procedures in place that protect users against doxxing and allow them to report any violations. Review that information and note how to get in contact with their support teams.

With these non-technical steps out of the way, you can begin to think about the more technical steps you can take: both as precautionary steps ahead of time, and if you have to respond to a doxxing incident.

# Minimizing Your Publicly Available Data

The most obvious protective measure you can take to prevent being doxxed is to reduce the amount of material there is about you online.

Data brokers are companies that subsist entirely off collecting this data,

repackaging it, and selling to the highest bidders. The information they gather is often from public records and online trackers, and augmented by commercial transactional data. It is a parasitic, rotten industry that survives by invading the privacy of everyday people online. Due to public pressure, many of these companies offer ways for users to opt out of their data being shared. We recommend starting with White Pages, Instant Check Mate, Acxiom, Intelius, and Spokeo. Also take a look at these other helpful guides on how to remove yourself from people-finding services and data brokerage companies.

For a more thorough—though more costly—approach, several professional services like DeleteMe or Privacy Duck claim to help minimize the data available about you online from these data brokers and similar sources. Beware that data brokers work by *continually* scraping public records and repopulating their data, and so services like these can require ongoing subscriptions to be most effective. They also cannot (and do not) promise comprehensive data minimization across all possible sources. Users should conduct their own research and consider whether these kinds of services can successfully target the data sources you are most concerned about.

## Safe Browsing

Sometimes software behaving as expected can lead to our secrets ending up in places they shouldn't. For example, suggested friends lists can sometimes "out" you to people despite your having multiple accounts for the very purpose of keeping parts of your life separate.

Most other common examples are the fault of user tracking, which you have the power to minimize. If that's a concern you want to address, here are some steps you can take:

**Check how "fingerprintable" your browser is with our tool Cover Your Tracks.** This will give you an idea of how capable those very trackers are of uniquely identifying you and your actions online. We also recommend **adding our install-and-forget tracker blocking tool, Privacy Badger**, which is designed to silently halt those trackers and let you browse in peace.

From there, you can begin to assess the rest of your personal data hygiene online. To protect your account security, are you **using strong unique passwords and multi-factor authentication** on each of your accounts? Both of these steps will

do wonders in preventing your account from being maliciously hijacked.

As you consider each of the accounts you use online, we highly recommend taking a moment with each to **look at what information you share**. Do you share with them the bare minimum so that you can continue to use their software, or are you giving more than what's necessary? Instead of listing your mother's maiden name, prom date, or pet's name in response to security questions, consider inputting a random passphrase instead and keeping it in your password manager. And instead of handing over your phone number—a common bit of information behind account compromise and unwanted identification—consider what the phone number will be used for, whether Facebook or Twitter or whomever actually needs it, and if you can substitute your mobile number for something less individually identifying like a Google Voice number. Remaining mindful of what information you're sharing, as well as when and where you're sharing it will do wonders for your data hygiene.

## Incident Response Plan

Being doxxed is a stressful, scary thing to endure. In the event of it happening, the last thing you'll want to be doing is scrambling at the last minute to figure out how to respond. Having a ready-made plan in place will do wonders for you. Here are some suggestions on where to start:

**Decide which accounts to lock or temporarily deactivate if you're being doxxed.** Make a list. It will help to walk through the process of deactivating/locking the account for each so that you can take note of any special steps that they may require.

**Have a spreadsheet template handy to record incidents as they happen**. You'll want to have fields ready to mark when something took place, who it appears to be from, where it's happening, and any details about what happened. Making this log will be incredibly useful: it can help you identify where the weakness is in your personal data security, as well as provide a detailed log of events that you could pass along to others.

## Care for Yourself, Care for Others

Finally, you'll want to include people from your trusted networks to help you in

this process. Knowing you've got friends to support you if you're being doxxed will not only ease the burden of stress and labor, but can also alert them to how they might be implicated. We recommend going over this whole process with a trusted friend. Knowing they're available to take over during a crisis will ease your mind. Reciprocating that help for them builds community trust.

Data hygiene is a form of community self-care. Establishing data hygiene standards with your close network can be a way of caring for yourself, and them. After all, an incident on one node of a network could compromise other nodes on the same network. Caring for your own data hygiene will in part strengthen your community's, and vice versa.

# JOIN EFF LISTS

## Discover more.

Email updates on news, actions, events in your area, and more.

Email Address

Postal Code (optional)

Anti-spam question: Enter the three-letter abbreviation for Electronic Frontier Foundation:

**SUBMIT**

# RELATED UPDATES

## How to Make a Mastodon Account and Join the Fediverse



**DEEPLINKS BLOG BY RORY MIR | DECEMBER 1, 2022**



**DEEPLINKS BLOG BY DAVE MAASS | AUGUST 10, 2022**
## How California Reproductive Health Workers Can Protect Information They Submit to the Government



**DEEPLINKS BLOG BY BENNETT CYPHERS | MAY 11, 2022**
## How to Disable Ad ID Tracking on iOS and Android, and Why You Should Do It Now

## SafeGraph's Disingenuous Claims About Location Data Mask a



**DEEPLINKS BLOG** BY BENNETT CYPHERS, GENNIE GEBHART | MAY 6, 2022

## Dangerous Industry



**DEEPLINKS BLOG** BY DALY BARNETT | MAY 4, 2022

## Digital Security and Privacy Tips for Those Involved in Abortion Access



**DEEPLINKS BLOG** BY COOPER QUINTIN | MARCH 28, 2022

## An EFF Investigation: Mystery GPS Tracker On A Supporter's Car

## Another Tracker Scanning App Highlights the Need for a Better Way to Protect Victims From Digital



**DEEPLINKS BLOG** BY KAREN GULLO | MARCH 25, 2022
## Stalking



**DEEPLINKS BLOG** BY EVA GALPERIN | MARCH 4, 2022
## Telegram Harm Reduction for Users in Russia and Ukraine



**DEEPLINKS BLOG** BY JASON KELLEY | DECEMBER 21, 2021
## Podcast Episode: The Life of the (Crypto) Party

## Certbot's Instructions Generator now available in Farsi



**DEEPLINKS BLOG** BY ALEXIS HANCOCK | NOVEMBER 10, 2021

ELECTRONIC FRONTIER FOUNDATION
eff.org
Creative Commons Attribution License

# EXHIBIT E

eff.org



# Choosing your Web Host

**KEEPING YOUR SITE ALIVE**

DDOS ATTACKS

EVALUATING YOUR THREAT MODEL

CHOOSING YOUR WEB HOST

    HOSTED SERVICES

    SELF-HOSTED SERVERS

    SHARED HOSTING PROVIDERS

ADDING DDOS PROTECTION TO YOUR SITE

BACKING UP YOUR SITE

MIRRORING YOUR SITE

TIPS

# Choosing your Web Host

There are three basic categories of web hosting you can choose from:

**Hosted services** are web hosts that let you create an account and start making content. These include services such as Blogger and Wordpress.com

**Shared hosting providers** are companies that sell web hosting on servers that host other customers' websites and often provide you with control panel software, such as cPanel. When using a shared hosting provider, you will need to

install and configure your website yourself, but the shared hosting provider will run the web servers for you. These include companies like Dreamhost and Bluehost.

**Self-hosted servers** are servers you run for yourself. This category includes Virtual Private Servers (VPS) and physical servers that are in data centers. Self-hosted servers are often the best solution for organizations with very specific website needs, however they also require systems administrators and web developers. **Protecting self-hosted servers from DDOS attacks is a subject that falls outside of the scope of this guide**, but there are some DDoS-protection services that can be helpful for those who self-host their site.

A handful of companies offer DDoS protection services at an additional cost. There are also companies and non-profit organizations that offer DDoS protection at little or no cost to certain defined groups.

Each category of web hosting has advantages and drawbacks. The following section will help you assess which type of web host is best for you.

## Hosted Services

**Advantages**:

- It's easy because no in-house technological expertise is needed.
- It's free!
- Large companies that provide hosted services generally have stable and secure servers that are capable of absorbing DDoS attacks.
- Updates, security, and DDoS defense are the platform provider's responsibility (although you still need to protect your site by having a strong password).

**Drawbacks**:

- Hosted services often have content policies which may not work for your website.
- You have little control over which themes and plugins you can use.
- If your website requires more complicated types of content than blog posts and pages, hosted services might not work for you.

**Required level of technical expertise for set up**: Low. If you can use Facebook, you can use a hosted service.

**How to handle DDOS**: You have no control over any of it, but your service provider should help. These large web hosts are unlikely to inform users of a DDoS attack, but their infrastructure leaves them well-equipped to withstand most such attacks.

## Shared Hosting Providers

**Advantages**:

- After installing your content management system (CMS), you can install any themes or plugins you want, including automatic backup and security plugins, or custom plugins just for your site.
- The shared hosting provider is responsible for server updates.

**Disadvantages**:

- It costs money (~$10/month).
- You are responsible for keeping your CMS and plugins up-to-date yourself. Out-of-date plugins can result in your site getting hacked.
- Because you are sharing a server with other websites, their security problems could potentially compromise your website.
- Some shared hosting providers will disable your account if you experience a DDoS attack.

**Required level of technical expertise for set up:** Medium. You will need to know how to navigate your host's control panel, use FTP/SFTP/SSH software, and install and configure a CMS.

**How to handle DDOS:**

- Make sure your CMS uses caching, which can help handle large amounts of traffic. If you are using Wordpress, EFF recommends the WP Super Cache plugin. Drupal has caching built-in.
- A Content Delivery Network (CDN) or caching service can provide a layer in front of your site to absorb the attack. CDNs are available to work with most hosting scenarios.
- If you're getting DDoSed, talk to your hosting provider about how to keep your website up.

## Self-Hosted Servers

**Advantages:**

- You can set up your website exactly the way you want it.
- If you have the technical expertise, you can use a dedicated caching proxy

like Varnish or Squid.
- You can also use a DDoS protection service to protect your site against DDoS attacks.
- If have the technical expertise, you can set up a load balancer that distributes your web traffic across several web servers. This is how big websites like Facebook, Google, and Amazon manage to stay up even when they're flooded with massive amounts of traffic.

**Disadvantages**:

- Professional systems administrators and developers are required to maintain self-hosted servers.
- This option is more expensive than shared hosting.

**Required level of technical expertise for set up:** High. You will need a professional system admin and someone who knows how to install and configure a CMS.

ELECTRONIC FRONTIER FOUNDATION
eff.org
Creative Commons Attribution License

# EXHIBIT F



**Cloudflare** Docs

## DNS

# Proxy status

The **Proxy status** of a DNS record affects how Cloudflare treats incoming traffic to that record. Cloudlare recommends enabling our proxy for all `A`, `AAAA`, and `CNAME` records.

| Type | Name | Content | Proxy status | TTL | Actions |
|------|------|---------|--------------|-----|---------|
| A | blog | 192.0.2.1 | Proxied | Auto | Edit ▸ |
| A | shop | 192.0.2.2 | DNS only | Auto | Edit ▸ |

## Proxied records

When an `A`, `AAAA`, or `CNAME` record is **Proxied** — also known as being orange-clouded — DNS queries for these will resolve to Cloudflare Anycast IPs instead of their original DNS target. This means that all requests intended for proxied hostnames will go to Cloudflare first and then be forwarded to your origin server.

This behavior allows Cloudflare to optimize, cache, and protect all requests to your application, as well as protect your origin server from DDoS attacks ⬚.

Because requests to proxied hostnames go through Cloudflare before reaching your origin server, all requests will appear to be coming from Cloudflare's IP addresses (and could potentially be blocked or rate limited). If you use proxied records, you may need to adjust your server configuration to allow Cloudflare IPs.

## Limitations

### Record types

By default, Cloudflare only supports proxied `A`, `AAAA`, and `CNAME` records. You cannot proxy other record types.

If you encounter a `CNAME` record that you cannot proxy — usually associated with another CDN provider — a proxied version of that record will cause connectivity errors. Cloudflare

is purposely preventing that record from being proxied to protect you from a misconfiguration.

### Ports and protocols

By default, Cloudflare only proxies HTTP and HTTPS traffic.

If you need to connect to your origin using a non-HTTP protocol (SSH, FTP, SMTP) or the traffic targets an unsupported port at the origin, either leave your records unproxied (DNS-only) or use Cloudflare Spectrum.

### Pending domains

When you onboard your domain onto Cloudflare, Cloudflare protection will be in a pending state until we can verify ownership. This could take up to 24 hours to complete.

This means that DNS records - even those set to proxy traffic through Cloudflare – will be DNS-only until your zone has been activated and any requests to your DNS records will return your origin server's IP address.

If this warning is still present after 24 hours, refer to our troubleshooting guide.

For enhanced security, we recommend rolling your origin IP addresses at your hosting provider after your zone has been activated. This action prevents your origin IPs from being leaked during onboarding.

### Windows authentication

Because Microsoft Integrated Windows Authentication, NTLM, and Kerberos violate HTTP/1.1 specifications, they are not compatible with proxied DNS records.

To solve this issue, we recommend using Cloudflare Zero Trust.

---

# DNS-only records

When an `A`, `AAAA`, or `CNAME` record is **DNS-only** — also known as being gray-clouded — DNS queries for these will resolve to the record's normal IP address.

In addition to potentially exposing your origin IP addresses to bad actors and DDoS attacks 🗗, leaving your records as **DNS-only** means that Cloudflare cannot optimize, cache, and protect requests to your application.

Cloudflare Dashboard ⬈   ·   Community ⬈   ·   Learning Center ⬈   ·   Support Portal ⬈

Edit on GitHub ⬈   ·   Updated 4 hours ago

# EXHIBIT G

Information for Privacy and Proxy Service Providers, Customers and Th...       about:reader?url=https%3A%2F%2Fwww.icann.org%2Fresources%2F...

Case 3:23-mc-80005   Document 2   Filed 01/05/23   Page 110 of 115

icann.org

# Information for Privacy and Proxy Service Providers, Customers and Third-Party Requesters

5–6 minutes

Privacy and proxy service providers offer services that permit customers to register a domain name without publishing the customer's contact information in the Registration Data Directory Service (RDDS), also known as WHOIS.

A **Privacy Service** allows a customer to register a domain name as the registered domain name holder (meaning that the customer's name appears in the registrant name" field in WHOIS). Alternative, reliable contact information (such as a mail-forwarding email address) is published by the service provider in place of the customer's personal contact information.

A **Proxy Service** allows a customer to use a domain name without displaying any of the customer's information in WHOIS. The proxy service provider is the registrant of record (the registered domain name holder) and provides alternative, reliable contact information. This service is legally distinct from a privacy service because the proxy service provider is the registered domain name holder (which attaches certain legal rights and responsibilities for a domain). The proxy service provider licenses use of the domain

Information for Privacy and Proxy Service Providers, Customers and Th...          about:reader?url=https%3A%2F%2Fwww.icann.org%2Fresources%2F...

Case 3:23-mc-80005   Document 2   Filed 01/05/23   Page 111 of 115

name to the customer via its agreement with the customer.

## 2013 RAA

The 2013 RAA requires that privacy and proxy service providers
that are affiliated with an ICANN-accredited registrar to:

- Disclose service terms (including pricing), on the provider's
  website and/or registrar's website and abide by such terms;

- Publish an abuse/infringement point of contact;

- Disclose the business contact information on the provider's
  website and/or registrar's website; and

- Publish and abide by terms of service and description of
  procedures on its website and/or registrar's website, such as
  handling of abuse or trademark infringement reports,
  communication handling, conditions of ending service, WHOIS
  data publication conditions, and access to support services.

If you have a complaint regarding any of these items, please
submit a Privacy/Proxy Registration Complaint Form.

## New ICANN Privacy and Proxy Service Provider Accreditation Program

ICANN is implementing a new accreditation program for privacy
and proxy service providers pursuant to policy recommendations
[PDF, 1.24 MB] developed through the ICANN multi-stakeholder
policy development process. Once this program is fully
implemented, ICANN-accredited registrars may not knowingly
accept registrations involving a privacy and/or proxy service from
an entity that is not accredited by the ICANN organization.

Information for Privacy and Proxy Service Providers, Customers and Th...    about:reader?url=https%3A%2F%2Fwww.icann.org%2Fresources%2F2F...

Case 3:23-mc-80005    Document 2    Filed 01/05/23    Page 112 of 115

If you would like to submit an inquiry about the Privacy and Proxy Service Provider Accreditation Program, please contact the ICANN Global Support Center.

**Quick Links**

- List of ICANN-Accredited Privacy and Proxy Service Providers

- Privacy and Proxy Service Provider Customer Educational Information

Domain Name System

Internationalized Domain Name ,IDN,"IDNs are domain names that include characters used in the local representation of languages that are not written with the twenty-six letters of the basic Latin alphabet ""a-z"". An IDN can contain Latin letters with diacritical marks, as required by many European languages, or may consist of characters from non-Latin scripts such as Arabic or Chinese. Many languages also use other types of digits than the European ""0-9"". The basic Latin alphabet together with the European-Arabic digits are, for the purpose of domain names, termed ""ASCII characters"" (ASCII = American Standard Code for Information Interchange). These are also included in the broader range of ""Unicode characters"" that provides the basis for IDNs. The ""hostname rule"" requires that all domain names of the type under consideration here are stored in the DNS using only the ASCII characters listed above, with the one further addition of the hyphen ""-"". The Unicode form of an IDN therefore requires special encoding before it is entered into the DNS. The following terminology is used when distinguishing between these forms: A domain name consists of a series of ""labels"" (separated by

Information for Privacy and Proxy Service Providers, Customers and Th...          about:reader?url=https%3A%2F%2Fwww.icann.org%2Fresources%2F...

Case 3:23-mc-80005   Document 2   Filed 01/05/23   Page 113 of 115

""dots""). The ASCII form of an IDN label is termed an ""A-label"". All operations defined in the DNS protocol use A-labels exclusively. The Unicode form, which a user expects to be displayed, is termed a ""U-label"". The difference may be illustrated with the Hindi word for ""test"" — परीका — appearing here as a U-label would (in the Devanagari script). A special form of ""ASCII compatible encoding"" (abbreviated ACE) is applied to this to produce the corresponding A-label: xn--11b5bs1di. A domain name that only includes ASCII letters, digits, and hyphens is termed an ""LDH label"". Although the definitions of A-labels and LDH-labels overlap, a name consisting exclusively of LDH labels, such as""icann.org"" is not an IDN."

# EXHIBIT H

An official website of the United States government. Here's how you know

**Michael C. McGarrity**
Assistant Director, Counterterrorism Division
**Calvin A. Shivers**
Deputy Assistant Director, Criminal Investigative Division

Federal Bureau of Investigation

Statement Before the House Oversight and Reform Committee, Subcommittee on Civil Rights and Civil Liberties
Washington, D.C.
June 4, 2019

# Confronting White Supremacy

*Statement for the Record*

Good afternoon, Chairman Raskin, Ranking Member Roy, and members of the subcommittee. Thank you for the opportunity to appear before you today. We welcome the opportunity to discuss the FBI's efforts to combat the threats posed by domestic terrorism and hate crimes. Though we discuss these threats as separate entities and address them from multiple FBI divisions, they are in no way mutually exclusive. Rather, we apply the expertise, passion, and resources of both the Counterterrorism and Criminal Investigative Divisions to these overlapping threats, working to prevent the threats on the horizon and provide justice to the victims of hate crimes. Because individual incidents may be investigated as both domestic terrorism and as a hate crime, we bring the force of the FBI to bear against any event that may fall into these categories, investigating crimes through the lenses of both divisions unless or until one avenue is foreclosed or eliminated.

The FBI's counterterrorism mission is dedicated to the disruption of terrorist actors and the prevention of terrorist attacks in the homeland. The FBI's hate crimes mission is to enforce federal civil rights statutes and ensure the protected rights of all persons are preserved. In furtherance of these intersecting missions, our Counterterrorism and Criminal Investigative Divisions are often focused on prevention and enforcement, respectively. While the Counterterrorism Division tends to be more prevention driven, focusing on identifying, disrupting, and dismantling terrorists before they act, our teams devoted to hate crimes concentrate on the victims of attacks and ensuring they are provided the justice they deserve. We would like to take the opportunity to discuss both of these complementary missions with you in further detail, and to explain how we believe each division serves as a force multiplier for the other.

**Domestic Terrorism**

While the threat posed by terrorism has evolved significantly since 9/11, preventing terrorist attacks from foreign and domestic actors remains the FBI's top priority. We face persistent threats to the homeland and to U.S. interests abroad from foreign terrorist organizations (FTOs), homegrown violent extremists (HVE), and domestic terrorists, also referred to as domestic violent extremists. The threat posed to the United States has expanded from sophisticated, externally directed plots to attacks conducted by self-radicalized lone actors who mobilize to violence based on international and domestic violent ideologies.

The FBI categorizes terrorism investigations into two main programs: international terrorism and domestic terrorism. International terrorism includes cases in which subjects are members of designated FTOs, state sponsors of terrorism, and HVEs. The latter are individuals inside the United States who are inspired by international terrorism who have been radicalized to violence primarily in the United States, and who are not receiving individualized direction from FTOs. Domestic terrorists are individuals who commit violent criminal acts in furtherance of ideological goals stemming from domestic influences, such as racial bias and anti-government sentiment.

Our operational tempo has risen significantly in the last few years and remains high. Still, we, along with our law enforcement partners, face significant challenges in identifying and disrupting HVEs and domestic terrorists who seek to perform terrorist attacks within the United States. This is due, in part, to the ease of online self-radicalization to violence and the corresponding lack of direct connections between known terrorists or FTOs and unknown radicalized violent extremists, which shortens the window of opportunity for our investigative teams to identify and disrupt an individual before that individual decides to act.

Domestic terrorism is defined by statute as any act dangerous to human life that violates U.S. criminal laws and appears to be intended to intimidate or coerce a civilian population, influence the policy of a government by intimidation or coercion, or affect the conduct of a government by mass destruction, assassination, or kidnapping. The act in question must occur primarily within the jurisdiction of the United States. We assess domestic terrorists pose a persistent and evolving threat of violence and economic harm to the United States; in fact, there have been more domestic terrorism subjects disrupted by arrest and more deaths caused by domestic terrorists than international terrorists in recent years. We are most concerned about lone offenders, primarily using firearms, as these lone offenders represent the dominant trend for lethal domestic terrorists. Frequently, these individuals act without a clear group affiliation or guidance, making them challenging to identify, investigate, and disrupt.

It is important to remember that in line with our mission to protect the American people and uphold the Constitution of the United States, no FBI investigation can be opened solely on the basis of First Amendment-protected activity. Rather, domestic terrorism investigations are opened on the basis of information concerning the occurrence or threat of violent criminal actions by the individual in furtherance of an ideology.

We understand that your request for today's hearing arises from a concern about racially motivated violent extremism, which may result in the commission of hate crimes. We appreciate your interest in this issue. Individuals adhering to racially motivated violent extremism ideology have been responsible for the most lethal incidents among domestic terrorists in recent years, and the FBI assesses the threat of violence and lethality posed by racially motivated violent extremists will continue. The current racially motivated violent extremist threat is decentralized and primarily characterized by lone actors. These actors tend to be radicalized online and target minorities and soft targets using easily accessible weapons.

Violent extremists are increasingly using social media for the distribution of propaganda, recruitment, target selection, and incitement to violence. Through the Internet, violent extremists around the world have access to our local communities to target and recruit like-minded individuals and spread their messages of hate on a global scale. The recent attack at the Chabad of Poway Synagogue in Poway, California, not only highlights the enduring threat of violence posed by domestic terrorists, but also demonstrates the danger presented by the propagation of these violent acts on the Internet. The attacker in Poway referenced the recent mosque attacks in Christchurch, New Zealand, and we remain concerned that online sharing of livestreamed attack footage could amplify viewer reaction to attacks and provide ideological and tactical inspiration to other domestic terrorists in the homeland.

We would like to assure you that the FBI takes very seriously the threat of domestic terrorism, and we have aligned our resources to reflect this. Every FBI field office has at least one counterterrorism squad, and some offices have a squad solely dedicated to domestic terrorism investigations. At FBI Headquarters, we have an entire section of agents and analysts dedicated to support and enable field investigations, in addition to intelligence units which provide critical information to decision makers and help the FBI think strategically about the domestic terrorism threat.

As the threat to harm the United States and U.S. interests evolves, we are adapting to and confronting these challenges. In April 2019, the FBI established the Domestic Terrorism-Hate Crimes Fusion Cell to address the intersection of the complementary FBI missions to combat domestic terrorism and provide justice to those who are victims of hate crimes. Comprised of subject matter experts from both the Criminal Investigative and Counterterrorism Divisions, the cell offers program coordination from FBI Headquarters. This fusion cell helps ensure seamless information sharing across divisions and augments investigative resources to combat the domestic terrorism threat, ensuring we are not solely focusing on the current threat or most recent attack, but also looking to the future to prevent the next one.

We also rely heavily on the strength of our federal, state, local, tribal, and territorial partners to combat the domestic terrorism threat. Working with our Joint Terrorism Task Forces across the country, the FBI continues to identify, assess, and disrupt domestic terrorism threats in the homeland. The task force officers on our Joint Terrorism Task Forces not only serve as force multipliers in the domestic terrorism fight, but also bring invaluable experience and familiarity with the local community to our investigations. Evidence of these critical partnerships is demonstrated by the frequency with which the FBI received domestic terrorism-related tips from these agencies. In conjunction with these partners, we constantly collect and analyze intelligence concerning the ongoing threats posed by domestic terrorists. We continue to emphasize the importance of information sharing with both these partners around the country, and with our international partners around the world.